[Civ. No. 16581. Third Dist. July 26, 1978.]

JOHN K. ORME et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA EX REL. DEPARTMENT OF WATER
RESOURCES, Defendant and Respondent.

**COUNSEL**

Kronick, Moskovitz, Tiedemann & Girard and Frederick G. Girard for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Robert L. Bergman, Assistant Attorney General, and John M. Morrison, Deputy Attorney General, for Defendant and Respondent.

## OPINION

EVANS, J.—Plaintiffs, John K. Orme and Edith B. Orme, appeal from that portion of an inverse condemnation judgment which awarded them approximately $67,700 damages and denied interest on the entire award from the date the first damage occurred, and from the order granting the motion of the state, taxing engineering costs and attorney fees.

### STATEMENT OF FACTS

The plaintiffs appeal only from post trial decisions of the court rendered after a jury returned a verdict in plaintiffs' favor. The following factual summary is not disputed and has been gleaned from the recitation of facts contained in the parties' briefs.

This is an inverse condemnation action brought by plaintiffs as a result of water damages to their rice-producing property. The real property consists of 147 acres of land located near the west side of the Thermalito Afterbay in Butte County. The Thermalito Afterbay is part of the State of California's water project at Oroville Dam and is used as a reservoir to ensure that despite fluctuations in water flow caused when excess electricity is used to pump water back into the dam, a constant supply of water returns to the Feather River. In support of their claim, plaintiffs present evidence that in 1972, the Thermalito Afterbay, through ground-water percolation, leaked water which saturated the top two feet of soil on their land and caused the loss of a portion of the rice crop growing on the land at that time and resulted in physical damage to the land that required restoration work, which precluded plaintiffs from growing rice in 1973 and 1974 on their land which is the land's highest and best use.

Upon learning of the seepage, the State of California took remedial measures consisting of the application of an impervious blanket on the floor of the afterbay and the installation of a series of wells along its westerly perimeter. The wells were designed to pump water seeping from the afterbay back into the reservoir.

The use of the wells accomplished a reduction in the groundwater level below plaintiffs' property.

Plaintiffs utilized an expert who testified that the rise in hydrostatic pressure of water under plaintiffs' property during 1972 was caused by a malfunction and/or improper operation of well No. 3, which was one of two wells having a significant effect on plaintiffs' property.

The evidence presented by the State of California in defense of the action was that the 1972 saturation causing damage to plaintiffs' property was primarily the result of heavy rainfall, and not because of the functioning of the Thermalito Afterbay or any of its components.

A crucial factual issue at trial was whether water leaking from the Thermalito Afterbay was able to move up through the "hardpan" or "tight" soils and saturate the top two feet of plaintiffs' land.

Plaintiffs' expert (Mr. Gomez) testified that it did; the state's experts (Messrs. King and Begg) testified to the contrary. Plaintiffs' expert testified that when the capacity of well No. 3 was increased after correction of its malfunction, the hydrostatic pressure under plaintiffs' property was reduced to substantially preproject levels.

Plaintiffs produced evidence that as a result of the saturation, rutting of the land occurred during the rice harvest in 1972. The evidence indicated that the rise in hydrostatic pressure in October 1972, coupled with rainfall occurring before and during the harvest, caused the upper two feet of the soil to become nearly saturated which prevented the harvesting of a portion of plaintiffs' 1972 rice crop. As the upper two feet of the soil became saturated, the heavy rice harvesting equipment tended to bog down, causing deep ruts in the soil.

Plaintiffs' inability to plant a rice crop in 1973 and 1974 apparently was not related to the piezometric level or hydrostatic pressure under the property in those years but was rather a consequence of the serious rutting damage which occurred in 1972.

Plaintiffs produced evidence that the loss of the use of the land for rice in 1973 was because the weather conditions in early 1973 did not permit the land restoration and preparation required, as a result of the 1972 rutting, early enough to plant a rice crop in 1973.

As a result plaintiffs were limited to planting a crop of oats and wheat in October of 1973. It was then too late to plant the rice crop. The oats and wheat crop was not ready for harvesting until May or June of 1974

which again precluded planting a rice crop for 1974 and resulted in plaintiffs' claim of loss of use for 1974.

The total damages, including loss of use, sought by plaintiffs was the sum of $71,676.89.[1]

The jury decided in plaintiffs' favor and awarded them $67,730.25 in damages. Judgment was entered accordingly.

(The dollar difference between the amount sought by plaintiffs and the amount of the jury verdict (all but $40) may be the result of the jury's acceptance of evidence that the average county yield was 56 sacks of rice per acre in 1972 rather than a yield of 60 sacks per acre as estimated by plaintiffs.)

Following entry of the judgment, plaintiffs filed a memorandum of costs and disbursements which included the sums of $28,993.57 for attorney fees and $12,157.67 for engineering fees. The State of California then filed a motion to tax costs contending that such fees are not recoverable in instances where a plaintiff secures a judgment for a "damaging" of an interest in real property as distinguished from a "taking."

The trial court accepted that contention and struck the attorney fees and engineering costs from plaintiffs' cost bill.

The judgment, when entered on November 17, 1976, did not provide for prejudgment interest. Subsequently, plaintiffs filed a "Motion to Correct or Amend Judgment in Regard to Prejudgment Interest." Plaintiffs contend that the $67,730.25 should draw interest (at 7 percent per annum) from October 25, 1972 (the earliest date of damage to the first crop). The trial court amended the judgment to provide that the sum of $25,849.42 would draw interest at 7 percent per annum commencing October 20, 1973, the sum of $28,671.48 would draw interest at 7 percent per annum commencing October 20, 1974, and the sum of $13,209.35 would draw interest at 7 percent per annum commencing October 20, 1975.

[1]Plaintiffs sought recovery for damage to growing crops, damage to real property, and permanent diminution in the value of real property in an amount totaling $146,520. At trial they dropped their claim of permanent diminution to the value of real property and limited their evidence showing (1) a partial loss of rice crop in the year 1972; (2) a loss of rental value in the year 1973; (3) the cost of restoration of real property; and (4) the loss of rental value in the year 1974, less the profit received from wheat and oat crops planted in the fall of the year 1973 and harvested in mid-1974.

## I

Plaintiffs first contend that the trial court erroneously granted defendant's motion to tax the costs of attorney fees and engineering costs. This contention has merit.

The trial court reasoned that such costs were not recoverable inasmuch as the land had merely been damaged and not taken within the contemplation of former Code of Civil Procedure section 1246.3. (Now Code Civ. Proc., § 1036.) Former section 1246.3 (present § 1036) provided that engineering costs and attorney fees are recoverable when there has been a "taking of any interest in real property."[2]

As it is clear that an interest in real property is involved,[3] our basic determination is whether there has been a taking within the contemplation of the statute.

In order for there to be a taking " '. . . there must be an invasion or an appropriation of some valuable property right which the landowner has to the legal and proper use of his property.' " (*Hilltop Properties* v. *State of California* (1965) 233 Cal.App.2d 349, 355-356 [43 Cal.Rptr. 605, 37 A.L.R.3d 109].) A taking of property within the constitutional guarantee means more than a physical change of possession; it entails the owner's permanent or temporary deprivation of use. (*Pacific Telephone etc. Co.* v. *Eshleman* (1913) 166 Cal. 640, 664 [137 P. 1119].)

The question arises because the federal Constitution mentions only a taking and not a damaging, thus giving rise to the belief that only the taking or acquisition of an interest in real property may be compensated; however, with the growth of public governmental actions affecting private use of land, the meaning of taking has been extended and broadened to

---

[2]This section provided: "In any inverse condemnation proceeding brought for the taking of any interest in real property, the court rendering judgment for the plaintiff by awarding compensation for such taking, . . . shall determine and award or allow to such plaintiff, as a part of such judgment . . . such sum as will, in the opinion of the court . . . reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding."

[3]The People do not dispute the fact that the right to grow crops on land is an interest in real property. Prior to the entry of a contract for the sale and severance of growing crops, the interest in the crops is an interest in real property. (See *Carey* v. *Glenco Citrus Products* (1965) 235 Cal.App.2d 572, 578 [45 Cal.Rptr. 365]; *Mosekian* v. *Davis Canning Co.* (1964) 229 Cal.App.2d 118, 121-122 [40 Cal.Rptr. 157]; *List* v. *Sandell* (1941) 42 Cal.App.2d 505, 507 [109 P.2d 376].) At common law the right to growing crops, recognized as an interest in real property, was known as "emblements." (Smith & Boyer, Survey of the Law of Property (1971) pp. 244-249.)

include damage and destruction of land. (Kratovil & Harrison, *Eminent Domain—Policy and Concept* (1954) 42 Cal.L.Rev. 596, 599; see also Note (1953) 66 Harv.L.Rev. 1134; *Holtz* v. *San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648, 654, fn. 4 [131 Cal.Rptr. 646, 552 P.2d 430].)

Evidently to ensure that the harsh federal standard would not prevail in California, the phrase "or damaged" was added to the California Constitution. (See Cal. Const., art. I, § 19.) Defendant argues that since section 1246.3 (present § 1036) does not contain the phrase "or damaged," mere damage does not give rise to the right to recover attorney fees and engineering costs. However, as noted by one commentator, "It is evident that where a court is willing to take a liberal view of 'taking' of 'property,' an 'or damaged' . . . provision is unnecessary." (Kratovil & Harrison, *supra,* 42 Cal.L.Rev. at p. 601.) The apparent limit and harsh federal constitutional provision has been tempered by the decision in *United States* v. *Kansas City Ins. Co.* (1949) 339 U.S. 799 [94 L.Ed. 1277, 70 S.Ct. 885]. The United States Supreme Court there held that a "taking" within the contemplation of the federal Constitution occurred under circumstances similar to those here presented.

In *United States* v. *Kansas City Ins. Co.,* apparently for navigational purposes, the Corps of Engineers maintained the Mississippi River at a high flood level. (*Id.,* at p. 800 [94 L.Ed. at p. 1280].) The groundwater table level was raised because of the increased pressure and water percolated from the river to respondent's land preventing the land from draining which resulted in destruction of its value as farmland. (*Id.,* at p. 802 [94 L.Ed. at p. 1281].) The Supreme Court held that a compensable taking had occurred. (*Id.,* at p. 809 [94 L.Ed. at p. 1285].)

The defendant's argument that plaintiffs may not recover for a taking because the state's water pumps have lowered the groundwater table level to levels comparable to those before construction of the afterbay, reducing the damage to a temporary status, is meritless. "There is no justification for a holding that the test of 'taking' is whether the lands thereafter may be restored to their original condition." (*People* v. *Peninsula Title Guar. Co.* (1956) 47 Cal.2d 29, 34 [301 P.2d 1]; *City of Long Beach* v. *Aistrup* (1958) 164 Cal.App.2d 41, 48 [330 P.2d 282].)

Plaintiffs lost a significant portion of the 1972 rice crop and were unable to plant rice for two years due to the wetness or saturation of the ground and the resulting inability to rehabilitate the land and rid it of ruts which resulted from the attempt to salvage some of the crop during the first wet year.

Finally, as stated in a recent California Supreme Court inverse condemnation case, *Holtz* v. *San Francisco Bay Area Rapid Transit Dist., supra,* 17 Cal.3d at page 653 (where plaintiff sought to recover for land subsidence caused by an excavation by defendant), ". . . the legislative history of section 1246.3 supports the conclusion that it was designed to expand the right to recover litigation costs beyond situations in which tangible real property has literally been removed from possession of its owner. . . . It is apparent . . . that the Legislature intended to include not only the taking of physical possession or title to real property, but also encroachments upon lesser property interests." The court also refused to be limited by decisions that distinguished between taking and damaging on the ground the distinction was blurred (17 Cal.3d 655, fn. 5); and a distinction between these terms is not necessary for recovery. (*Ibid.*)

*Stone* v. *City of Los Angeles* (1975) 51 Cal.App.3d 987 [124 Cal.Rptr. 822], cited by the People as purportedly supporting their contention that notwithstanding *Holtz,* there is still no recovery for mere damage is not controlling. The recovery of costs was there denied because there was no legally recognized interest in real property. In *Stone,* plaintiff recovered damages for diminished value to his property caused by an unreasonable delay in the initiation of previously announced condemnation proceedings. (*Id.,* at p. 990.) The loss in the value of land under such circumstances does not appear to be an interest in real property but rather a property right; the distinction here asserted by defendant between "taking" and "damaging" was not involved. (See *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 51-53 [104 Cal.Rptr. 1, 500 P.2d 1345].)

Plaintiffs lost a substantial interest in their property during the crop years of 1973, 1974, and 1975. Plaintiffs sustained permanent damage in the loss of profit on the crops which had been planted and for those which would have been planted had the saturation not occurred. The fact that the state's pumps returned the water table to its preproject level, allowing plaintiffs the full use of the land now, does not bring back the profits on three years of lost crops. Accordingly, we conclude that when a public agency causes injury to property by subterranean or surface flooding, even though the flooding is temporary in nature only, a taking of property within the meaning of Code of Civil Procedure section 1246.3 (now § 1036) occurs and litigation costs are recoverable.[4]

---

[4]Past inverse condemnation cases have distinguished between damage caused as a result of negligent activities and damage occasioned when the public project was functioning as intended. In the former case, no compensable taking was found to have occurred; in the latter, a compensable taking was found to have occurred. (See e.g., *Youngblood* v. *Los Angeles County Flood Control Dist.* (1961) 56 Cal.2d 603, 607 [15

## II

Plaintiffs contend that the trial court's award of interest was in error because the trial court awarded interest on each award to commence on the date each year's damage occurred. We disagree.[5]

The jury awarded plaintiffs the total sum of $67,730.25 for damages sustained as a result of the groundwater seepage. The original award was amended to provide for interest on the damages making up the total award as follows: on $25,849.42 from October 20, 1973; on $28,671.48 from October 20, 1974, and on $13,209.35 from October 20, 1975.

■ The purpose of an award of interest is to provide just compensation for a person deprived of property by the state. (*Holtz, supra,* 17 Cal.3d at p. 657 and authorities cited therein; see also Comments, *Interest as Damages in California* (1958) 5 UCLA L.Rev. 262, 263.)

■ "The right to prejudgment interest in inverse condemnation accrues as of the date the compensable taking or injury occurred without regard to the nature or scope of the compensable event." (*Holtz, supra,* 17 Cal.3d at p. 657; see *Heimann* v. *City of Los Angeles* (1947) 30 Cal.2d 746, 758-759 [185 P.2d 597].)

In this case, the earliest date damage for a particular crop loss could have occurred was the date plaintiffs could have sold their rice and received payment but did not because a crop had not been planted, or as in the first year, because a portion of the crop was lost due to water percolation from the afterbay. The evidence indisputably established that plaintiffs did not receive payment for a particular crop until approximately one year after its planting. Generally, payment was received the following October.

If plaintiffs were to be awarded interest on the lump sum, as plaintiffs contend they should, they would be unjustly enriched by an award of interest on an award for damages incurred after the date interest is ordered to run. The trial court's award was correct.

---

Cal.Rptr. 904, 364 P.2d 840].) This distinction is not involved in the present case since the afterbay was storing water as intended by the state.

[5]The state, relying on *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 299 [74 Cal.Rptr. 521, 449 P.2d 737], contends that except for the sum representing the cost of restoring plaintiffs' property ($4,335), the remainder of the judgment represents the actual value of loss of use of plaintiffs' land for which plaintiffs are not entitled to prejudgment interest. The state has not appealed.

The order taxing engineering costs and attorney fees is reversed; in all other respects the judgment is affirmed.

Puglia, P. J., and Reynoso, J., concurred.

A petition for a rehearing was denied August 21, 1978, and respondent's petition for a hearing by the Supreme Court was denied September 27, 1978.