[Civ. No. 48731. Second Dist., Div. Three. Mar. 30, 1979.]

THE PEOPLE EX REL. DEPARTMENT OF PUBLIC WORKS, Plaintiff, Cross-defendant and Appellant, v.
PENINSULA ENTERPRISES, INC., et al., Defendants, Cross-complainants and Appellants.

334

COUNSEL

Harry S. Fenton, Richard G. Rypinski, Joseph A. Montoya, Robert L. Meyer, Irwin Schulman and Robert W. Vidor for Plaintiff, Cross-defendant and Appellant.

Thomas G. Baggot and Gideon Kanner for Defendants, Cross-complainants and Appellants.

OPINION

KLEIN, P. J.—This case presents two appeals stemming from an eminent domain action wherein the primary issue of concern was the compensation to be awarded the owners of certain vacant land (hereinafter referred to as owners)[1] for a partial taking of their property by the State of California, acting by and through the Department of Public Works (hereinafter condemner).

STATEMENT OF THE CASE

Condemner initiated this action on July 14, 1972, in order to acquire 72,000 square feet of the subject property's 92,000 square feet for freeway purposes, specifically the construction of on and off ramps for the San Diego freeway. The owners were also to be deprived of access rights along 70 feet of the remainder's frontage. In addition to seeking the usual damages associated with such a taking, owners also sought damages for

---

[1]The subject property was owned successively during the pendency of the condemnation proceedings by first Peninsula Enterprises, Inc. and then Prairie Properties, a partnership, both organizations being linked by the common participation of Kenneth Battram. Also aligned with owners were several additional parties who held security interests in the subject property.

condemner's allegedly unreasonable actions during the precondemnation period.[2]

The trial was essentially conducted in three phases:[3] (1) a nonjury trial to establish whether condemner should be liable for precondemnation damages; (2) a hearing *in limine* determining the scope of permissible evidence; and (3) a jury trial on the value of the property taken and the amount of precondemnation damages to be awarded. At the conclusion of the first phase, the trial court determined that precondemnation damages for unreasonable delay and other oppressive conduct by condemner were appropriate and ruled that the period of chargeable delay would run from May 1, 1971, through and including entry of judgment, with one year subtracted therefrom as a reasonable period within which condemner could be expected to file and pursue to judgment its condemnation action. The parties had entered into a stipulation prior to trial that the date for evaluating the property taken would be July 14, 1972.

Following the third phase of the trial, the jury returned verdicts awarding $267,355.83 as the value of the property taken and $10,146.95 as the severance damages to the remaining property. The severance damages, however, were completely offset by the jury's determination that owners had received $21,216.35 in special benefits by virtue of the taking. Lastly, the jury awarded $102,133 as the amount of precondemnation damages through and including June 30, 1975.

After entry of judgment, condemner moved for a new trial on several grounds. The trial court conditionally granted the motion on the ground of excessive damages, the condition being that in lieu of a new trial owners could accept a remittitur to $200,000 as the value of the part taken, with a proportionate reduction in the precondemnation damages. Owners refused the remittitur and thus the order granting a new trial was allowed to stand.

Owners now appeal from the court's order, claiming that the reasons given by the court for granting a new trial were neither supported by the record nor within the requirements of Code of Civil Procedure section 657. Condemner cross-appeals from the judgment entered on the jury

---

[2]Such precondemnation damages are sometimes referred to as *Klopping* damages, with reference to *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]. (See discussion, *infra.*)

[3]The trial was conducted under the law applicable prior to the enactment of the current eminent domain law (Code Civ. Proc., § 1230.010 et seq., added by Stats. 1975, ch. 1275, § 2, operative July 1, 1976).

verdicts, contending that precondemnation damages were improperly awarded here.

## BACKGROUND

The property in question is located in the City of Torrance. It was, at the time of the taking, an irregularly shaped parcel of vacant land with a drainage swale down the middle.

The property was originally put together by Leo Goodman, a sophisticated land speculator, who purchased it in bits and pieces and apparently used it as a dump. Negotiations between Goodman and owners for the sale of the property initially began in 1964. At that time, a sale for $162,000 was agreed upon but ultimately fell through because of some zoning difficulties.

In the latter part of 1968, plans were drawn up by condemner's engineers for freeway ramp modification, which plans called for acquisition of a portion of the subject property. A "Freeway Agreement" providing for the closing of streets in the area of the ramp modifications was entered into by condemner and the City of Torrance on October 30, 1970. A map attached to this agreement depicted the proposed ramp changes.

Owners were aware of the plans for ramp modification when they again entered into negotiations with Goodman in 1968 for the sale of the property. The sale was finalized in December 1968 for a purchase price of $119,700. After they had acquired the subject property, owners caused a zoning change to be effected which permitted commercial development of the site; they also expended some $25,000 in grading and filling of the front portion of the property.

Condemner (acting through the Division of Highways) first contacted owners concerning possible acquisition of a portion of their property on January 10, 1969, at which time owners were shown a map depicting the proposed ramp modifications. Condemner's agent indicated that the acquisition would occur within about a year's time. On November 13, 1969, condemner sent one of owners' affiliated companies a map which outlined the area to be taken in red.

During the period of September to November of 1969, owners negotiated a lease of the subject property with Asahi Fancy Koi, Inc., which intended to operate an ornamental fish farm thereon. Although both parties to the lease knew of the proposed condemnation, the plans drawn for the fish farm project indicated that it would encroach upon the area needed for the ramp construction. For this reason, and upon the request of condemner, the City of Torrance denied a building permit for the fish farm and the lease was mutually terminated.

On May 21, 1970, an agent of condemner offered owners $134,600 for the portion of the subject property required for the ramp project. Owners rejected the offer as insufficient and indicated that they would procure their own appraisal and submit a counteroffer. In the meantime, condemner's agent had several discussions with owners concerning a possible swapping of properties (i.e., excess state land for the subject property).

Although owners obtained an appraisal of the property on June 17, 1970, which indicated that just compensation for the value of the part taken plus severance damages would be $256,300, it appears that no counteroffer was ever transmitted to condemner; owners did, however, inform condemner that its offer of $134,600 was "way, way low." On July 7, 1971, owners informed condemner that they had received an appraisal in excess of $300,000, but would not disclose the exact figure. When it became clear that condemner would only come up $10,000 to $20,000 in value, the negotiations broke down and reached a final impasse on July 21, 1971.

Meanwhile, owners made further efforts toward developing their property. In June of 1970 they submitted a set of plans for a three-story building to the City of Torrance for a preliminary planning check. Torrance officials apparently failed to take any action on the building plans and they were withdrawn by owners after some 30 to 60 days. Then, in June 1972, owners requested a zoning variance to permit the operation of a recreational vehicle storage business and a warehouse on the entirety of the property. The Torrance Planning Commission and the Torrance City Council, however, denied the variance, assertedly because of the incompatibility of the intended uses with the adjacent residential area and because owners had failed to establish hardship.

The agent who had been conducting the negotiations for condemner requested a condemnation resolution from the highway commission on November 19, 1971. The requested resolution was passed on January 20, 1972, but had to be amended on June 22, 1972, to correct an error in the legal description of the property. Condemner's action was filed on July 14, 1972.

At the time the action was filed, condemner's agent asked that a review be made of the appraisal upon which condemner's offer was based. When informed of the pending review, owners' attorney suggested that service of process be delayed until the appraisal review was completed. On September 29, 1972, condemner's agent informed owners' attorney that the offer could not be adjusted. Owners' attorney then asked for a further delay of two weeks in the service of the papers since the property was undergoing a change in title ownership. The transfer in ownership, however, did not take place until December 1972 and owners were served with summons and complaint on January 16, 1973, and January 19, 1973.

At trial, owners' valuation evidence was presented through the testimony of Kenneth Battram, one of owners' principals (see fn. 1, *ante*), and through appraisers Robert Bell and Earl Metcalfe. Condemner's valuation evidence was presented through appraiser James Reid, who, unlike the other appraisers, gave no opinion as to the amount of precondemnation damages.[4]

One fact deemed important by at least owners' witnesses in the valuation of the subject property which has not yet been mentioned was the extension of Prairie Avenue, the street on which the property fronts. When owners acquired the property in 1968, Prairie Avenue came to a dead end in its southward direction at an oil refinery. But in the late 60's plans were formulated to extend Prairie through the refinery and connect it with Madrona Avenue on the other side, the effect being to make

---

[4] The valuation testimony, together with the jury's determination of value and the trial court's proposed remittitur, are summarized in the following table:

| Witness | Part Taken | Severance Damages | Special Benefits | Precondemnation Damages (to 6-30-74) |
|---------|-----------|-------------------|------------------|--------------------------------------|
| Bell | $273,396 | $ 9,225 | -0- | $ 68,800 |
| Battram | $395,570 | $18,449 | -0- | $110,379 |
| Metcalfe | $309,608 | $13,892 | -0- | $ 82,290 |
| Reid | $143,212 | $12,990 | $32,773 | — |
| VERDICT: | $267,355.83 | $10,146.95 | $21,216.35 | $102,133 (to 6-30-75) |

TRIAL COURT'S PROPOSED REMITTITUR: $200,000 and a reduction of the precondemnation damages in a proportionate amount.

Prairie a through route to the Del Amo Shopping Center. Construction of the extension was occurring at the time of trial. Owners' witnesses opined that the extension of Prairie Avenue would enhance the value of the subject property by increasing the traffic passing by it.

I

OWNERS' APPEAL

As stated previously, owners' appeal relates to the adequacy of the trial court's order granting a new trial. Such orders are authorized by Code of Civil Procedure section 657, which requires a court granting a new trial to specify the ground or grounds upon which it is granted and to state the reason or reasons in support of each ground. (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 60 [107 Cal.Rptr. 45, 507 P.2d 653]; *Kolar* v. *County of Los Angeles* (1976) 54 Cal.App.3d 873, 876 [127 Cal.Rptr. 15].)

In the case at bench, the sole ground specified in the court's order granting a new trial was that of excessive damages.[5] Code of Civil Procedure section 657 provides that ". . . on appeal from an order granting a new trial . . . upon the ground of excessive . . . damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons . . . ."

---

[5]The court's order reads as follows:

"The motion for new trial, heretofore submitted on January 15, 1975, is granted on the ground of excessive damages, the granting of such motion to be limited, however, under the provisions of Section 662.5(b) CCP; to wit, the granting of a new trial is subject to the condition that such motion shall be denied if the defendants/cross-complainants consent to a reduction of the verdict/and or judgment as follows, which the Court determines from the evidence to be fair and reasonable:

"(a) a reduction of the award for the part taken (parcel 56058-1) from the $267,355.83 to $200,000;

"(b) a reduction of the precondemnation damages as awarded in items 4a, 4b and 4c of the verdict in a proportionate amount.

". . . . . . . . . . . . . . . .

"The Court's reasons are as follows:

"The property a portion of which was taken in this action is a highly irregularly shaped parcel bounded by the San Diego Freeway on the East and Prairie Avenue on the West. Reference is made to the maps introduced into evidence for the configuration thereof. Such property was purchased by defendants by deed dated 12/24/68 for $119,000 [*sic*]. It was improved by them with fill and compaction in an amount of approximately $25,000 bringing their total cost to approximately $145,000. The verdict of the jury (which was roughly ¾ thereof) for the value of the part taken on 7/14/72 was $267,355.83. Taking the lowest valuation of the remainder from the evidence and adding this to the value of the

■ We note initially that we disagree with owners' arguments aimed at establishing that the reasons given by the trial court in support of its new trial order lacked the degree of specificity mandated by Code of Civil Procedure section 657. An inspection of the instant new trial order (fn. 5, *ante*) reveals that the court below acted in conformity with the statute by providing the parties with a statement of reasons which indicated the portions of the record which persuaded the court that the damages awarded were excessive; the court did not merely restate the ground for its decision in terms of ultimate fact. (*Stevens* v. *Parke, Davis & Co., supra,* 9 Cal.3d 51, 61; *Scala* v. *Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 366-367 [90 Cal.Rptr. 592, 475 P.2d 864]; cf. *San Francisco Bay Area Rapid Transit Dist.* v. *Fremont Meadows, Inc.* (1971) 20 Cal.App.3d 797, 801 [97 Cal.Rptr. 898].)

■ Owners' contentions going to the trial court's exercise of discretion in ordering a new trial are, however, another matter. In particular, owners contend that the court erred by either considering impermissible facts or facts having no support in the record or by ignoring uncontradicted evidence.

---

part taken assessed by the jury the value of the entire parcel was said to be about $347,355.83.

"If it be assumed that defendants made a bargain purchase and the value in 1969 is increased by 20%, or (including improvements) a total of $175,000, the increase in value of the entire parcel in a period of 3½ years was estimate [*sic*] by the jury verdict to have been double.

"The Court is of the opinion that the most the evidence would reasonably support would be the sum of $200,000 for the entire parcel. The other sales upon which the experts based their opinions of value were not of properties that had the peculiarities of shape and location of the subject property, and the Court is of the opinion that a sale of the subject property within 3½ years of the date of value is better support for an opinion of value than such other sales. Although defendants (and cross-complainants) contended that such 1969 [*sic*] sale (for reasons which do not appear) was a bargain, the Court finds it was an open market sale by Mr. Leo Goodman the president of defendants Publix Title Company and Record Searching Title Company. Mr. Goodman is an attorney, and as owner and dealer in real property parcels 'too numerous to mention', was a highly sophisticated seller.

"In addition to the sale by Mr. Goodman there were other sales reasonably near the subject property which persuasively indicated a lower value than as found by the jury. No radical changes of circumstances was [*sic*] introduced into evidence (such as a shopping center across the street, etc.) which would have indicated a more than doubling of the improved value of the subject property between early 1969 and middle 1972.

"Since the time when the delay in condemning the property commenced to be excessive substantially coincided with the date of value as to the part taken such excessive verdict also was reflected in the precondemnation damages in a proportionate amount.

" . . . . . . . . . . . . . . . . . . . . "

■ It is, of course, fundamental that the granting or denying of a motion for a new trial is within the sound discretion of the trial court and its decision will not be interfered with on appeal absent a clear abuse of that discretion. (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92]; *Kolar v. County of Los Angeles, supra,* 54 Cal.App.3d 873, 880.) Code of Civil Procedure section 657 incorporates this rule by providing that an order granting a new trial on a ground such as excessive damages shall be reversed on appeal "only if there is no substantial basis in the record" for any of the reasons specified in the order. (*San Francisco Bay Area Rapid Transit Dist.* v. *Fremont Meadows, Inc., supra,* 20 Cal.App.3d 797, 803-804.)

■ Owners' criticism of the trial court's exercise of discretion in the present case centers on the court's use of the 1968 sale of the subject property to assess the opinions of the valuation witnesses. Specifically, the court's assessment technique consisted of taking the price owners paid for the property in 1968, adding thereto the costs of the grading and filling, and then increasing the sum obtained by 20 percent to arrive at a figure for the "value" of the property in early 1969. The court thereupon determined that the jury's assessment of value for the entire parcel of property as of July 14, 1972, was roughly double the court's early 1969 figure and concluded that the evidence at trial would not support such an increase in value over a three-and-one-half-year period. (See fn. 5, *ante.*)

■ It cannot be disputed that the trial court was entitled to at least consider the 1968 sale of the subject property in reaching its decision on the new trial motion. We initially note in this regard that Evidence Code section 815 specifically permits valuation witnesses to take into account reasonably recent, open market sales of the property to be valued in arriving at their opinions. Here, in fact, the opinion of condemner's appraiser Reid was based to a great extent on his analysis of the 1968 sale. (See *City of Los Angeles v. Retlaw Enterprises, Inc.* (1976) 16 Cal.3d 473, 479 [128 Cal.Rptr. 436, 546 P.2d 1380].)

Furthermore, the trial court's consideration of the 1968 sale (or, for that matter, any comparable sale relied upon by the witnesses; see Evid. Code, § 816) was not, by itself, inconsistent with the provisions of subdivision (a) of Evidence Code section 813. That subdivision provides that the value of property may only be shown by the opinion testimony of either qualified experts or the owner of the property. In assessing the opinions of the valuation witnesses, however, the trier of fact is not

required to accept the testimony of any one witness in total, but may instead, after balancing and reconciling the various opinions of the witnesses and their bases, decide upon a value which falls within the range of the opinion testimony. (See *City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.3d 473, 491-492; *South Bay Irr. Dist.* v. *California-American Water Co.* (1976) 61 Cal.App.3d 944, 965-966 [133 Cal.Rptr. 166]; *Redevelopment Agency* v. *Modell* (1960) 177 Cal.App.2d 321, 326-327 [2 Cal.Rptr. 245].) Here, in ruling upon the motion for a new trial, the trial court was vested with the same powers granted a trier of fact to weigh the evidence and resolve issues of credibility. (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662]; *Dietrich* v. *Litton Industries, Inc.* (1970) 12 Cal.App.3d 704, 717 [90 Cal.Rptr. 856].)[6] The court could thus properly consider the 1968 sale price of the subject property in performing its function of weighing the opinions of the witnesses to reach its own conclusion of an appropriate value.[7]

What remains to be considered is the propriety of what the trial court did with the 1968 sale price. The first difficulty arises with the court's adding the $25,000 cost of the grading and filling to the property's sale price to obtain owners' total cost for the property. The apparent

---

[6]The jury herein was instructed pursuant to BAJI No. 11.80 as follows: ". . . You must resolve any conflict in the testimony of the witnesses by weighing each of the opinions expressed against the others, taking into consideration the reasons given for the opinion, the facts relied upon by the witness, his relative credibility and his special knowledge, skill, experience, training, and education."

[7]We note that two arguments made by owners against the sufficiency of the instant new trial order are merely misdirected contentions that the trial court misweighed the evidence. For example, owners assert that the trial court should not have reached the conclusion that the 1968 sale was an open market transaction since the evidence showed that the sale was actually a "bargain purchase" resulting from the seller's desire to sell in 1968 for tax purposes and the fact that owners were really the only buyers in the market for this property. Owners, however, ignore other facts, such as that the seller, Goodman, was a highly sophisticated real estate investor (a fact noted in the court's order), that he testified that he had been overly optimistic in trying to obtain a higher price for the property in 1968, and that while he admitted the sale in 1968 gave him certain tax advantages, he averred that there was no particular urgency for the sale. Further, owners admitted in an answer to an interrogatory that the 1968 sale was an open market transaction. It is to be noted also that in doing its calculations to determine a value for the subject property in early 1969, the trial court gave owners the benefit of the doubt by assuming a bargain purchase in 1968.

Likewise, with respect to the court's statement that it perceived no radical change of circumstance such as would produce a doubling of the property's value, there was again a conflict in the evidence as to whether the extension of Prairie Avenue should be deemed to constitute such a radical change; the court's statement here was an implicit rejection of the testimony of owners' witnesses on this point.

purpose for doing this was to obtain a figure for the improved "value" of the property in early 1969. Yet even condemner acknowledges that the cost of improvements is not necessarily synonymous with the value they may bring to property. While it may be that the court's multiplying the total cost figure by 20 percent was an attempt to somehow take into account the extra value which might be attributed to the improvements, we perceive little in the evidence which would have permitted the court to select such an exact multiplier.[8] In any event, it is far from clear that this is what the court intended. The 20 percent multiplication factor chosen by the court may have resulted from its perception of what inflation or market forces did to the value of the subject property between December 1968 and early 1969, or it may have been selected to compensate for the court's initial assumption that the 1968 sale was a bargain purchase. In either case, we find no substantial support in the record for the figure chosen.

In addition, questions arise as to the propriety of the trial court even attempting to arrive at a value figure for the property in early 1969. First, opinions as to the value of property at a time other than the established valuation date have been deemed improper. (See *State of California* ex rel. *Dept. of Water Resources* v. *Clark* (1973) 33 Cal.App.3d 463, 467-469 [109 Cal.Rptr. 39].) Second, none of the witnesses here ever expressed an opinion going to the subject property's value in early 1969. Since the opinions of valuation witnesses are the only permitted evidence of the value of property (Evid. Code, § 813, subd. (a)), there appears to have been no basis for the court's determination of the 1969 value of the subject property. And without a valid basis for establishing the subject property's improved value in early 1969, the trial court lacked the ability to make any comparison between that value and the jury's verdict.[9]

---

[8]The only apparent evidence on this point was Battram's opinion at the hearing *in limine* that the total value of the improvements was $37,000.

[9]We note that even if there had been some basis for determining the property's value in early 1969, the trial court had before it only the sparsest of testimony as to the trend in values since that date. In particular, appraiser Bell admitted on cross-examination to having preliminarily set the subject property's value at $2.50 per square foot in June 1969, at $3.41 per square foot in 1970, and at $3.40 per square foot in July 1971 before finally arriving at a figure of $3.80 per square foot for July 1972. Appraiser Metcalfe testified that the average sale price for property in the Torrance area fell within the $4-5 per square foot range in 1968 while reaching a level of about $8 per square foot in April 1973. (A comparison of these figures with the trial court's determination that the value of the subject property should only have increased from $175,000 (about $2.43 per square foot) to $200,000 (about $2.77 per square foot) during the period of "early" 1969 to July 1972 indicates that the court gave little, if any, credence to the testimony of these two witnesses

■ Condemner correctly points out that even if some of the court's reasons supporting the order for a new trial are without substantial support in the record, the order must nevertheless be affirmed if any one reason is adequately supported. (Code Civ. Proc., § 657; *Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 345 [126 Cal.Rptr. 731].) ■ A review of the instant new trial order (fn. 5, *ante*), however, reveals that the court's abuse of discretion in making a comparison of the jury's verdict with some assumed value for early 1969 having no support in the record carried over into every part of the court's specification of reasons. For example, the court at one point mentions "other sales" near the subject property as persuasively indicating a lower value than as found by the jury, but then continues in the same paragraph to state that there were no radical changes of circumstances which would support a more than doubling of the improved value between early 1969 and mid-1972. It thus appears that the "other" reasons given by the trial court in the order were not really independent reasons, but merely the court's explanation of how it had tested its theory that the value of the subject property should not have doubled in three and one-half years, a theory which we have determined was not properly based in the evidence. We therefore conclude that the instant new trial order cannot be sustained on the ground of excessive damages.

Condemner also argues that even if the order was improperly granted on the basis of excessive damages, it should still be affirmed since it should have been granted on another ground stated in condemner's motion for a new trial, namely error in law. (See *Worden* v. *Gentry* (1975) 50 Cal.App.3d 600, 606 [123 Cal.Rptr. 496].) ■ The error in law claimed by condemner was the admission in evidence of testimony concerning ground leases on noncomparable parcels of property for the purpose of supporting the opinions of owners' witnesses as to the amount of precondemnation damages.

There is no question but that the proper measure of precondemnation damages here was the reasonable rental value of the property lost to owners. (*Stone* v. *City of Los Angeles* (1975) 51 Cal.App.3d 987, 993 [124 Cal.Rptr. 822].) But as pointed out by condemner, Evidence Code section 818, which permits a witness to take into account leases on other property in arriving at an opinion of net rental value, requires that the leases be of

on this point.) Condemner's appraiser Reid opined that property values in the subject area had not increased much since 1968, but qualified his opinion by adding "without inflation." (It might also be noted that the court did not mention this area of the testimony at all in its new trial order.)

comparable properties. That section, however, is expressly directed toward a determination of the "capitalized value of the reasonable net rental value attributable to the property or property interest being valued . . . ."[10] Here, the capitalization method of valuation was not employed by owners' witnesses, apparently because of the lack of market data on short-term ground leases of vacant land with the same characteristics of the subject property.

Instead, owners' witnesses adopted a methodology whereby they examined ground leases in the general area of the subject property to determine the prevailing percentage rate relationship between the value of underlying vacant land and the rent it will bring from a tenant developing the property. The testimony regarding the results of the witnesses' inquiry was thus admitted only to show what owners of property in the general area expected as a return on their investments, and not to establish any absolute rental values for noncomparable properties. Limited to such purpose, the testimony was properly admitted as shedding some light on the appropriate amount of precondemnation damages. (Cf. *City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.3d 473, 485-487.) Moreover, since condemner offered no evidence on the amount of precondemnation damages suffered by owners, nor even suggested an alternative method for determining such damages, it is hardly in a position to complain about the court's acceptance of owners' evidence on this issue.[11]

In view of the foregoing, we conclude that the order granting a new trial must be reversed.[12] We turn now to a consideration of condemner's cross-appeal from the reinstated judgment. (See *Mercer* v. *Perez* (1968) 68 Cal.2d 104, 124 [65 Cal.Rptr. 315, 436 P.2d 315].)

[10]Evidence Code section 818: "For the purpose of determining the capitalized value of the reasonable net rental value attributable to the property or property interest being valued as provided in Section 819 or determining the value of a leasehold interest, a witness may take into account as a basis for his opinion the rent reserved and other terms and circumstances of any lease of comparable property if the lease was freely made in good faith within a reasonable time before or after the date of valuation."

[11]Condemner additionally points out that at least one of owners' witnesses relied in part on a listing for a ground lease, rather than a completed transaction, in determining the prevailing percentage return rate and contends that this conflicted with the provision in Evidence Code section 822, subdivision (b), which makes offers to lease inadmissible. But even assuming it was error for the witness to rely on the listing, we cannot conclude that such error mandated the granting of a new trial in view of the other properly admitted testimony on percentage return rates.

[12]This holding renders unnecessary a discussion of condemner's arguments regarding whether the scope of the court's new trial order should be viewed as including the liability as well as the damages phases of the trial.

## II

### Condemner's Cross-appeal

On cross-appeal, condemner makes numerous contentions challenging the propriety of an award of precondemnation damages here. Such damages were first recognized in this state in *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, wherein the court stated at pages 51-52: "[W]hen the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated."

■ Before proceeding to a discussion of condemner's arguments, however, we note our rejection of owners' contention that condemner somehow waived the right to challenge the award of precondemnation damages by failing to introduce any evidence as to the proper amount of such damages or by arguing to the jury that it should not compromise its verdict but rather should accept entirely the opinions of value offered by one side or the other. The issues raised by condemner on this cross-appeal relate solely to the liability questions which were resolved by the trial court, and not to any damage assessment determinations made by the jury after liability had already been established. Neither condemner's failure to introduce evidence on the proper amount of precondemnation damages nor its argument to the jury can be construed as demonstrating acquiescence in the trial court's adverse rulings regarding liability for precondemnation damages, to which timely objections were made. We now consider condemner's contentions.

1. ■ *Necessity of Filing a Timely Claim Before Precondemnation Damages Could Be Awarded.*

Condemner first asserts that recovery of precondemnation damages was barred here by owners' failure to file a timely claim for damages as was required during the pendency of this action by Government Code section 911.2.[13] That section provides that ". . . A claim . . . shall be

---

[13]The filing of a claim as a prerequisite for maintaining an action against a public entity for a taking of or damage to private property has since been eliminated by the enactment of Government Code section 905.1 (added by Stats. 1976, ch. 96, § 1, p. 155, eff. Jan. 1, 1977). Section 905.1 has no application here since its effective date occurred subsequent to the adjudication of the issue of owners' compliance with the claims statute. (See *City of Los Angeles* v. *Superior Court* (1977) 73 Cal.App.3d 509, 513-514 [142 Cal.Rptr. 292]; see

presented . . . not later than one year after the accrual of the cause of action." (See *Stone* v. *City of Los Angeles, supra,* 51 Cal.App.3d 987, 996.) An analysis of this issue requires that we first expand somewhat upon the procedural history of this case.

Owners first asserted a right to precondemnation damages in an amended and supplemental answer to condemner's condemnation complaint. Condemner, however, demurred to and moved to strike the portion of the answer alleging precondemnation damages on the ground that such damages could only be asserted by way of cross-complaint, which complaint condemner urged would be barred by owners' failure to file a timely claim with the State Board of Control. Condemner's motion to strike was granted, causing owners to file a cross-complaint in inverse condemnation for the purpose of alleging precondemnation damages. Condemner then demurred to the cross-complaint on the ground that owners had failed to file the required claim. When said demurrer was sustained, owners filed for the first time, on September 14, 1973, a claim for precondemnation damages. Following the denial of this claim, owners filed a first amended cross-complaint in inverse condemnation. Condemner's demurrer to this amended cross-complaint was overruled.

Condemner's argument that owners' claim was untimely is premised upon an assumption that owners' cause of action for precondemnation damages accrued at the latest on or about January 5, 1972, which was more than one year before owners' claim was filed. Condemner arrives at said accrual date by taking July 7, 1971, as the date when the impasse in negotiations between the parties occurred[14] and adding thereto six months (actually just short of that time) as the reasonable period during which condemner could have been expected to file suit (by analogy to former Code Civ. Proc., § 1243.1, repealed by Stats. 1975, ch. 1275, § 1, p. 3409).

We deem condemner's arguments in this regard to be unmeritorious in view of *Richmond Redevelopment Agency* v. *Western Title Guaranty Co.*

also *Wedding* v. *People* ex rel. *Dept. of Transportation* (1979) 88 Cal.App.3d 719 [152 Cal.Rptr. 181].)

[14]Actually, it appears from the record that the impasse referred to by condemner occurred on July 21, 1971.

(1975) 48 Cal.App.3d 343 [122 Cal.Rptr. 434], which was decided after the pretrial proceedings discussed above were completed. In *Richmond Redevelopment,* the court expressly held that when an eminent domain action has been commenced by a public entity, the proper method for the condemnee to seek damages for the entity's unreasonable precondemnation actions is by way of answer to the condemnation complaint and not by way of cross-complaint; the rationale is that in such circumstances the precondemnation damages constitute part of the eminent domain award. (*Id.,* at p. 350.) Furthermore, it appears to be well established that a property owner need not file a claim against a public entity before seeking damages by way of answer in a direct condemnation proceeding brought by that entity. (*City of Oakland* v. *Nutter* (1970) 13 Cal.App.3d 752, 768 [92 Cal.Rptr. 347]; *City of Fresno* v. *Hedstrom* (1951) 103 Cal.App.2d 453, 460-461 [229 P.2d 809]; see *People* ex rel. *Dept. Pub. Wks.* v. *Metcalf* (1978) 79 Cal.App.3d 1, 10 [144 Cal.Rptr. 657]; cf. *Stone* v. *City of Los Angeles, supra,* 51 Cal.App.3d 987, 996, wherein the court held that a timely claim was a prerequisite to an award of precondemnation damages in an inverse condemnation action.)

From the foregoing, it is apparent that the trial court in the present case erred when it struck the portion of owners' amended answer which alleged precondemnation damages. Owners' amended answer thus correctly raised the issue of precondemnation damages, and in a manner which did not require the filing of a claim. It was only the trial court's error which caused owners to eventually file a cross-complaint in inverse condemnation. We hold that under these circumstances compliance with the claims statute was not required.

2. *Finding of Unreasonable Precondemnation Delay.*

Condemner contends that the trial court erred in selecting May 1, 1971, as the date from which condemner could be charged with unreasonable delay in bringing this action. The court arrived at this date by reasoning as follows: The October 30, 1970, freeway agreement between condemner and the City of Torrance was the equivalent of an announcement that the subject property would be taken; the six-month period which followed (or to and including April 30, 1971) was the time within which condemner should have either acquired the property by settlement or

filed suit (by analogy to former Code Civ. Proc., § 1243.1); its failure to do either started the period of unreasonable delay running.[15]

Condemner first argues that the adoption of a formal resolution of condemnation is the only event which can trigger the condemning agency's duty to move quickly toward acquisition of the property in question. It urges that the adoption of the October 30, 1970, freeway agreement was merely in the nature of general planning and thus did not call for the type of rapid action that a formal condemnation resolution mandates.[16] We disagree.

We note initially that in *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 52, the Supreme Court referred simply to delay following the issuing of "precondemnation statements," without further qualification, in discussing what type of unreasonable conduct could give rise to precondemnation damages. In that case, the defendant city had initiated formal condemnation proceedings against the plaintiffs' properties, but abandoned the lawsuits when it appeared that funding for its proposed project was in jeopardy. However, in its resolution authorizing dismissal of the condemnation actions, the defendant city also indicated its firm intention to acquire the plaintiffs' properties at some future time. (*Id.,* at p. 42.) Our Supreme Court held that since the plaintiffs had alleged a loss of rental income due to these precondemnation announcements, they had stated a cause of action in inverse condemnation. (*Id.,* at pp. 52-53.)

The opinion in *Klopping,* however, left it far from clear whether a formal resolution to condemn is a prerequisite to precondemnation delay damages. There was, to be sure, some suggestion that such a resolution is not required when the Supreme Court noted in a footnote: "To allow recovery in every instance in which a public authority announces its intention to condemn some unspecified portion of a larger area in which an individual's land is located would be to severely hamper long-range planning by such authorities [citation], some of which may be required by state law [citation]. On the other hand, it would be manifestly unfair and violate the constitutional requirement of just compensation to allow a condemning agency to depress land values in a general geographical area

---

[15]Precondemnation damages were actually awarded only from May 1, 1972, because of the court's ruling that one year should be subtracted from the delay period as the time within which condemner could reasonably be expected to bring the case to judgment.

[16]This precise contention was made but not addressed in the recent case of *Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144, 151 [148 Cal.Rptr. 640, 583 P.2d 165].

*prior to making its decision to take a particular parcel located in that area.* [Citations.]" (*Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 45, fn. 1; italics added.) But in a later footnote, the court appeared to give its approval to the denial of inverse condemnation damages in a prior Court of Appeal decision. *Hilltop Properties* v. *State of California* (1965) 233 Cal.App.2d 349 [43 Cal.Rptr. 605, 37 A.L.R.3d 109], on the basis that there had been no formal announcement to condemn in that case. (*Klopping* v. *City of Whittier, supra,* at pp. 52-53, fn. 5.)

Condemner argues that the situation in the case at bench is similar to that considered in *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111]. In *Selby,* a city and county adopted a general plan which contained a circulation element depicting a proposed street extension through the plaintiff's undeveloped property. The plaintiff was subsequently denied a building permit by the city because its building plans failed to provide for the proposed street extension. In holding that the plaintiff had no grounds for recovering damages from the county under *Klopping,* the Supreme Court distinguished that case from the one before it by noting: "The adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property. . . . In order to state a cause of action for inverse condemnation, there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury. [Citation.] The county has not placed any obstacles in the path of plaintiff in the use of its land. . . . Furthermore, the plan is subject to alteration, modification or ultimate abandonment, so that there is no assurance that any public use will eventually be made of plaintiff's property." (*Id.,* at pp. 119-120; see also *Smith* v. *State of California* (1975) 50 Cal.App.3d 529 [123 Cal.Rptr. 745].)[17]

From the foregoing, it would appear that a property owner's ability to collect damages under *Klopping* for unreasonable precondemnation delay depends upon whether the conduct of the public agency in question has evolved to the point where its announcements result in a special and direct interference with the owner's property; the widespread impact resulting from mere general planning is noncompensable. (*Jones* v. *People* ex rel. *Dept. of Transportation, supra,* 22 Cal.3d 144, 152; *Jones*

---

[17]The court in *Selby,* however, determined that the plaintiff had stated a cause of action against the city in mandamus (but not inverse condemnation) for the city's refusal to issue the building permit. (*Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d at pp. 123-125, 127-128.)

v. *City of Los Angeles* (1979) 88 Cal.App.3d 965, 971-972 [152 Cal.Rptr. 256].)

We conclude that the type of direct and special interference required for precondemnation damages can occur even in the absence of a formal resolution of condemnation. Here, the evidence showed that condemner's activities had gone beyond the point of general planning some time before the October 30, 1970, freeway agreement. Indeed, an agent of condemner approached owners as early as January 1969 regarding possible acquisition of their property, at which time owners were informed the acquisition would take place within a year. Further, in November of 1969 condemner made available to owners a map depicting the portion of their property to be taken. Perhaps most significant is the fact that condemner's agent made an offer on May 21, 1970, to purchase the required portion, which offer thus preceded the freeway agreement by several months. Most certainly, an offer to purchase would not have been made in May 1970 had condemner not at that point already made a determination that a portion of the subject property would be needed for freeway purposes. Granted, the trial court did not view any of these early activities as in themselves placing a duty upon condemner to move quickly toward condemnation. Their occurrence, however, no doubt permitted the court to conclude that by the time of the October 30, 1970, freeway agreement, condemner's activities had reached the acquiring rather than planning stage and that the freeway agreement in question should therefore be treated as the type of precondemnation announcement resulting in direct and special interference with private property with which the court in *Klopping* was concerned.

Condemner additionally argues that there was insufficient evidence to support the court's conclusion that any delay in the filing of the condemnation action of more than six months following the adoption of the freeway agreement was unreasonable. Admittedly, were we the triers of fact we might not have reached the same conclusion, especially in view of the evidence disclosing that there were ongoing negotiations between the parties for the sale of the subject property during most of the period preceding the condemnation suit. The determination of the reasonableness of the delay was, however, unquestionably within the province of the trial court sitting as the trier of fact during the liability phase of the trial. (*Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 55.) In light of the testimony establishing that condemner's efforts to acquire the subject property went back to January of 1969, almost two and one-half years before the period of unreasonable delay was found to have begun, we

cannot say that there was no substantial evidence here to support the court's determination in this regard (see *Wittenbach* v. *Ryan* (1976) 63 Cal.App.3d 712, 716 [134 Cal.Rptr. 47]; *Arnold* v. *Browne* (1972) 27 Cal.App.3d 386, 393 [103 Cal.Rptr. 775]).

As we have determined that precondemnation damages were properly awarded here on the basis of condemner's unreasonable delay in filing suit, we need not address condemner's contention that there was inadequate evidence to support the trial court's conclusion that condemner was also chargeable with other "oppressive and unreasonable conduct" in the precondemnation period.[18] ▮ Recovery of precondemnation damages under *Klopping* requires a showing of either unreasonable delay or "other unreasonable conduct," but not both. (*Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 52; see *Jones* v. *City of Los Angeles, supra,* 88 Cal.App.3d 965, 971, fn. 3.)

3. ▮ *Allowance of Delay Damages as to the Whole of the Property.*

Condemner next contends that the trial court erred in allowing precondemnation damages to be assessed as to the entire property when it was clear from as early as January 1969 that only about three-fourths of the subject property was to be taken.

Condemner cites no authority for this contention and its argument in support thereof appears to concede that the degree to which the whole of the property was affected by condemner's precondemnation activities was a question of fact to be resolved by the trial court. Here, the court specifically found that precondemnation damages should be awarded as to the entire parcel "because any development of any prospective remainder as a single parcel would be physically and economically incompatible with development of said larger parcel to its highest and best use." ▮ ▮ This finding was amply supported by evidence presented by owners indicating that the impendency of the condemnation action would depress the market value of the entire property because potential lessees for the remainder portion would be

---

[18]The court's finding of "oppressive and unreasonable conduct" was based on its factual determination that the City of Torrance's denial of a building permit for the fish farm project and its later refusal to grant a zoning variance which would have permitted recreational vehicle storage use were both influenced by communications from condemner asking the city to hold development of the subject property in abeyance until condemner had an opportunity to acquire it.

reluctant to become involved in the uncertainties inherent in such an action and the period of construction to follow.[19]

4. ▆▆▆ *Allowing Precondemnation Damages to Accrue Beyond the Time Condemner Filed Its Action.*

Condemner argues that the trial court erred in ruling that precondemnation delay damages would continue to accrue until the time final judgment was entered and satisfied (excepting therefrom damages for the one-year period which the court felt was a reasonable time within which condemner could bring the case to judgment). Condemner submits that the period of unreasonable delay ended when it filed its condemnation action.

Condemner's argument has substantial merit. The holding of our Supreme Court in *Klopping* was that a landowner may recover for diminution in the market value of his or her property if it can be shown that such diminution resulted from the fact that "the public authority acted improperly either by *unreasonably delaying eminent domain action* following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation . . . ."(*Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 52; italics added.) Owners' arguments to the contrary notwithstanding, we do not read the italicized portion of the quoted language as referring to delayed *completion* of a condemnation proceeding.

Indeed, there is nothing in *Klopping* which would indicate that a public entity which has filed a condemnation action and is moving expeditiously toward final judgment should continue to be charged with precondemnation damages merely because the filing of the action has been preceded by a period of unreasonable delay. Under such circumstances, it must be concluded that the period of delay has ended with the filing of the action and that the public entity is therefore no longer engaged in the type of unreasonable behavior which is the basis of damages under *Klopping.* Were the rule otherwise, a public entity could be held responsible for litigation delay over which it had little or no control. In fact, it is apparent

---

[19]We find no error in the trial court's refusal to permit condemner's counsel to ask one of owners' witnesses whether he had considered the terms of the aborted fish farm lease before arriving at his opinion as to the reduced value of the remainder portion. The court was justified in concluding that any evidence of the lease's terms would be speculative on the issue of the remainder's market value since the lease actually covered an area larger than that of the remainder.

from the record before us that much of the delay in concluding the instant litigation can be attributed to owners' request that service of summons be postponed.[20]

We do not mean to imply from the above that there might not be some cases in which it would be appropriate to award damages for litigation delay. (Cf. *Stone* v. *City of Los Angeles, supra,* 51 Cal.App.3d 987, 990-991, where delay damages were apparently awarded for the period between the filing of the action and the serving of the summons (see fn. 20, *ante*).) It would seem, however, that an award of damages for delay following the initiation of a condemnation suit should be limited to those rare instances in which the condemning agency has purposely and in bad faith pursued an unconscionably dilatory course of action in its conduct of the litigation. The type of litigation delay stemming from an agency's legitimate employment of the procedural devices available to it as a party litigant, with the interests of the public to be protected, should not subject the agency to further liability. (Cf. *People* v. *Murata* (1960) 55 Cal.2d 1 [9 Cal.Rptr. 601, 357 P.2d 833].) For example, condemner's decision in the case at bench to seek a new trial could not, on the record before us, be viewed as the type of dilatory action which would merit the imposition of additional delay damages.

From the foregoing, it is clear that the portion of the judgment awarding precondemnation damages for the period subsequent to the filing of the direct condemnation action must be reversed. The trial court's award of such damages was not based upon any finding of bad faith, unconscionable procrastination on condemner's part, but rather was grounded on the court's mere assumption that one year was sufficient time for condemner to bring the case to final judgment. However, since it cannot be determined from the record on appeal whether owners are capable of making the type of showing which would justify an award of damages for litigation delay, we conclude that the cause should be remanded to afford them that opportunity.

---

[20]*Stone* v. *City of Los Angeles, supra,* 51 Cal.App.3d 987, does not, as owners suggest, stand for the proposition that delay damages automatically continue to accrue even after a condemnation action has been filed. In *Stone,* the condemning city filed its action on August 28, 1972, and served the Stones with summons on March 10, 1973; the Stones had, on September 6, 1972, filed a damage claim with the city based on unreasonable precondemnation delay. The trial court ruled that delay damages would only be recoverable for the period of September 7, 1971, (one year before the Stones' damage claim was filed) to March 10, 1973, the court observing that "*no one could conclude city had delayed unreasonably after the Stones were served . . . .*" (*Id.,* at p. 991, italics added.) On appeal, the only challenge to this ruling was to its disallowance of any damages accruing before September 7, 1971, which disallowance the appellate court upheld. (*Id.,* at pp. 996-997.)

5. *Award of Litigation Costs and Attorneys' Fees.*

Condemner lastly contends that the trial court erred in awarding owners their attorneys' and appraisers' fees incurred in connection with the precondemnation damages phase of the trial. The award was based on former Code of Civil Procedure section 1246.3.[21]

It might bear noting again that it was only because of the trial court's error in striking the portion of owners' amended answer alleging precondemnation damages that owners ultimately claimed such damages by way of an action in inverse condemnation. If this inverse condemnation action had not been filed, owners would not have been entitled to rely on Code of Civil Procedure section 1246.3. (*City of Los Angeles* v. *Monahan* (1976) 55 Cal.App.3d 846, 853-854 [127 Cal.Rptr. 763].)

In any event, in *Stone* v. *City of Los Angeles, supra,* 51 Cal.App.3d 987, 997-998, former Code of Civil Procedure section 1246.3 was expressly held to be inapplicable in a precondemnation delay type situation since that section "allows attorneys' fees and the pertinent costs claimed, only for a 'taking' of any interest in real property, not for mere damage."

Owners argue that this holding from *Stone* was impliedly overruled by our Supreme Court in *Holtz* v. *San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648 [131 Cal.Rptr. 646, 552 P.2d 430], wherein two property owners, in an inverse condemnation action for damages caused by the withdrawal of lateral support, were permitted to recover costs and attorneys' fees under section 1246.3. (*Id.,* at pp. 651-657.) The court did not feel itself bound by prior cases which had distinguished between a "taking" and a "damaging" of property since it found the distinction blurred. (*Id.,* at p. 655, fn. 5.)

Owners assert that the instant case presents a comparable situation to that considered in the recent case of *Orme* v. *State of California* ex rel.

---

[21]Former Code of Civil Procedure section 1246.3: "In any inverse condemnation proceeding brought for the taking of any interest in real property, the court rendering judgment for the plaintiff by awarding compensation for such taking, or the attorney representing the public entity who effects a settlement of such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will, in the opinion of the court or such attorney, reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding."

Section 1246.3 was repealed in 1975 (Stats. 1975, ch. 1275, § 1, p. 3409, eff. July 1, 1976); its language is now found in Code of Civil Procedure section 1036.

*Dept. Water Resources* (1978) 83 Cal.App.3d 178 [147 Cal.Rptr. 735]. In that case, the appellate court relied upon the *Holtz* decision in holding that two property owners who had sued in inverse condemnation for loss of use of their property due to seepage of ground waters could recover their costs and attorneys' fees under Code of Civil Procedure section 1246.3. (*Id.,* at pp. 183-185.) The court in *Orme* went on, however, to expressly distinguish the type of precondemnation damages situation considered in the *Stone* case, stating: "The loss in the value of land under such circumstances does not appear to be an interest in real property but rather a property right . . . ." (*Id.,* at p. 185.) As the decision in *Stone* thus appears to still be valid authority, we are compelled to conclude that the trial court in the case at bench erred in awarding owners their costs and attorneys' fees from the precondemnation damages portion of the trial.

### DISPOSITION

On the appeal by owners (Peninsula Enterprises, Inc., et al.), the order granting a new trial is reversed. On the cross-appeal by condemner (People of the State of California), those portions of the judgment awarding owners (1) precondemnation damages for the period subsequent to the filing of the direct condemnation action and (2) their costs and attorneys' fees incurred in connection with proving any precondemnation damages are reversed. The cause is remanded for a limited new trial on the issue of whether owners should be awarded any precondemnation damages for the period following the filing of the direct condemnation action. The judgment is in all other respects affirmed. Owners will recover their costs on appeal.

Allport, J., and Potter, J., concurred.

A petition for a rehearing was denied April 25, 1979, and the opinion was modified to read as printed above. The petition of plaintiff, cross-defendant and appellant for a hearing by the Supreme Court was denied May 24, 1979.