[Civ. No. 54457. Second Dist., Div. Five. May 1, 1980.]

LUISA SOLIS et al., Plaintiffs and Appellants, v.
SOUTHERN CALIFORNIA RAPID TRANSIT DISTRICT,
Defendant and Respondent.

COUNSEL

Ned Good for Plaintiffs and Appellants.

Hillsinger & Costanzo, John J. Costanzo, Darrell A. Forgey and David Ian Bell for Defendant and Respondent.

OPINION

**ASHBY, J.**—This is an action arising out of a bus-pedestrian accident. Plaintiff Luisa Solis sued for personal injuries and invasion of privacy, and her husband, plaintiff Carlos Solis, Sr., sued for loss of consortium. The trial court granted judgment of nonsuit on the invasion of privacy action at the close of plaintiff's case. On the other causes, the jury awarded judgment to defendant Southern California Rapid Transit District (RTD or SCRTD), finding no negligence on the part of the bus company. Plaintiffs appeal from the judgment and the denial of their motion for judgment notwithstanding the verdict.

The accident occurred at the intersection of 11th and Wall Streets in downtown Los Angeles at approximately 4 p.m. on January 7, 1974, during a heavy rain. At this intersection 11th is a four-lane street going one way west. The bus, which had been going northbound on Wall, turned left and struck plaintiff as she was crossing from the northbound to the southbound side of 11th. Plaintiff was struck in the number two lane, numbering from the north.

The evidence is uncontradicted that plaintiff crossed with a green light and pedestrian "walk" sign. The testimony of plaintiff and her two companions also squarely indicates plaintiff was crossing in the crosswalk.

Over the objection of plaintiff, an accident reconstruction expert was permitted to testify on behalf of defendant that in his opinion plaintiff was west of the crosswalk when struck by the bus. Of numerous contentions raised on appeal, plaintiff's main argument is that the trial court erred in admitting into evidence the expert's opinion. We likewise conclude there was no adequate foundation for the conclusion of the expert witness, and that the judgment must be reversed. As to the nonsuit on the privacy cause of action, we affirm.

### The Eyewitness Testimony

Plaintiff and her two coworkers, Clorine Couch and Wanda Cantrell, who all rode in a car pool, had just left their place of work approximately one block west of the intersection. They were walking on the north side of 11th Street eastbound toward the intersection, intending to cross 11th Street at the corner in order to reach Cantrell's car, which was parked at a lot on the southwest corner. It was plaintiff's habit always to use the crosswalk. Plaintiff was sharing her umbrella with Cantrell; Couch walked behind with her own umbrella. As they neared a mailbox on the corner, Cantrell remembered that she had an important letter to mail. Seeing that the light was about to turn green for crossing, Cantrell told plaintiff and Couch to go ahead while she mailed her letter. Plaintiff walked on to the corner, past the telephone pole before crossing. Photographs and a professionally prepared diagram of the intersection showed that from a position past the telephone pole plaintiff was on a line within the crosswalk. Couch went around Cantrell, to a point between the mailbox and the telephone pole.

With the traffic light green and the pedestrian sign "walk," plaintiff started across the street in the crosswalk and Couch crossed a few feet to the west.

Before stepping off the curb, Couch observed the bus on Wall Street. Couch, who walks faster than plaintiff, soon got ahead of plaintiff. As Couch reached almost the center of 11th Street she observed that the left-turning bus was not stopping, and was bearing down on her. Couch ran forward to avoid being hit, but even so she felt the bus hit her umbrella. She heard a thud behind her, and when she turned around she observed the bus had stopped, partly in the crosswalk and partly beyond the crosswalk. She went around to the front of the bus and observed plaintiff on the ground. Plaintiff, who suffered brain damage in the accident, testified at trial she did not remember the impact. She saw no traffic as she started to cross in the crosswalk. She stepped a few steps into the street, and did not know what happened to her after that. Cantrell did not see the impact because she was having difficulty with the mailbox. When she looked up from the mailbox she saw plaintiff flying through the air.

The bus driver, Crescencio Rodriguez, testified that when his light turned green he pulled up into the intersection a short distance and

paused three or four seconds waiting for three of four southbound cars to pass by. He then started turning left, not aiming for any particular lane of 11th Street since it was one way west and no other vehicles were turning onto 11th Street at the time. He did not see any pedestrian traffic. There was conflicting evidence whether his windshield was fogged or otherwise obscured by the heavy rain. As he was making his left turn at a speed he estimated at trial to be between five and eight miles per hour, and in his deposition between five and ten miles per hour, he saw out of the corner of his eye something moving fast toward the right front of the bus. He slammed on the brakes and estimated it took two or three seconds to stop. At the time the bus stopped he heard a thud and saw plaintiff. She lifted her hands in the air, took a couple of small steps backward and fell backward. He did not know whether she was in the crosswalk. He pulled on the emergency brake and got out to assist plaintiff.

Julia Sirias was a passenger on the bus. She was seated on the right-hand side of the bus in the first front-facing seat behind the aisle-facing seat behind the front door. She saw Clorine Couch cross the street and saw plaintiff on the street corner. Plaintiff moved fast toward the bus. The bus driver tried to stop but hit plaintiff.

### EVIDENCE AT THE SCENE

There were no skid marks on the street or any marks on the bus to indicate the exact portion of the bus which struck plaintiff. Horace Speed, a bus company supervisor, was dispatched to the scene at 4:07 p.m. and arrived at 4:13, prior to the arrival of the police or ambulance. He took a series of photographs with his instamatic camera. The photographs were introduced into evidence. They showed the bus on 11th Street westbound straddling lanes two and three (numbering from the north). The front wheels of the bus are in lane number two west of the crosswalk and the rear wheels are in lane number three in the crosswalk. Other photographs show plaintiff lying in the street being attended by various persons. Her feet, straddling the marker between lanes one and two, are facing the right-front portion of the bus near the right headlights and the rest of her body is in lane number one. After the photographs were taken, plaintiff was moved to the hospital and the bus was moved first to the curb and then to the bus terminal. There is no evidence of measurements being taken at the scene to determine the exact distance from the crosswalk of the bus or of plaintiff's body. It was stipulated the bus was forty feet long and nine feet six inches wide.

## The Expert Testimony

David Bruce Lent-Koop testified on behalf of defendant. He was an accident reconstruction specialist with bachelor of science and master of science degrees in engineering from UCLA specializing in transportation safety. He attempted to determine the approximate point of impact based upon the photographs of the bus and plaintiff's body, certain assumptions, and an experiment conducted by him. The experiment was conducted more than two years after the accident, as Lent-Koop was not contacted by the defense until March 8, 1976.

Lent-Koop assumed that the photographs in evidence showed the places where the bus and plaintiff's body came to rest after the accident. Knowing the length of the bus, he stated that based upon the photographs showing the bus in relation to the lane and crosswalk markings, it appeared the right front corner of the bus was 21 feet west of the western line of the crosswalk. Based upon his experiment (described below) he determined that the maximum speed the bus could have been going while negotiating the left turn was six miles per hour.

In Lent-Koop's opinion, plaintiff could not have been in the crosswalk at the point of impact, but rather was west of the crosswalk, based upon the following assumptions and chain of reasoning; assume the driver saw something out of the corner of his eye and had a standard reaction time of three-quarters of a second before deciding to brake; assume the driver had a standard reaction time of three-quarters of a second between deciding to brake and applying the brakes; assume the bus was going six miles per hour; assume the coefficient of friction between the bus tires and a wet street is .45; assume that the bus "came to a stop at the time that it hit the . . . pedestrian who took a couple of steps and then fell flat"; assume that plaintiff was walking at a standard walking pedestrian gait and that upon being hit by the bus her body was accelerated to the speed of the bus. Under such conditions the bus would have traveled a minimum of seventeen feet at six miles per hour using three-quarters second perception time, three-quarters second reaction time, and three feet to stop after brakes were applied. Since the right-front portion of the bus was 21 feet west of the crosswalk, in his opinion plaintiff was also west of the crosswalk at the time of impact.

Lent-Koop did not know the coefficient of friction of the wet street at the time of the collision, not having measured it. The coefficient of

friction could have been lower, as low as .35, which would have rendered the stopping distance longer. Lent-Koop did not know the condition of the bus tires at the time of the accident. If the tires were bald, the stopping distance would have been greater. There was no physical evidence how far the bus may have moved after impact or in what direction plaintiff "spun off."

In Lent-Koop's opinion because perception time varies so much from individual to individual, a range of three-quarters second to two seconds perception time is more appropriate than the standard three-quarters second. If the driver's perception time in this accident was greater than three-quarters second, the point of impact could have been in the crosswalk.

If the driver did not see plaintiff until impact and was going seven and a half miles per hour, the impact could have been in the crosswalk.

Lent-Koop's experiment from which he concluded that the maximum speed the bus could have been going was six miles per hour was this: Sometime after being contacted by the defense, more than two years after the accident, Lent-Koop went to the intersection in question to observe buses making left turns there. At the time of his experiment, it was not raining and the pavement was dry. "...I at one time went to the site of the collision and in fact parked myself in the parking lot here across the street, and unbeknownst to the buses and the bus drivers that traversed that area, timed them as they negotiated their turn within the intersection to get an appreciation of the times that the buses were taking to negotiate the turn and also an appreciation of the speeds in which they were negotiating the turn and also an appreciation of the locations of the bus at various points along the turn."

Next Lent-Koop performed an experiment specifically with the same bus and the same driver involved in the accident. There was no showing that the bus was in the same mechanical condition as at the time of the accident. Lent-Koop asked the driver, Rodriguez, "to negotiate the turn at a normal speed or the speed that he would have normally negotiated the turn." Rodriguez did this six or seven times. Lent-Koop "timed the period of time that it took the bus to negotiate the turn specifically from the initiation of the turn to the point where the left front corner of the bus crossed the west crosswalk line." As "more or less a check on my time calculations" Lent-Koop had an RTD official sit in the bus and read the speedometer during these turns.

Lent-Koop then instructed Rodriguez to negotiate the turn as fast as he could. Again Lent-Koop timed the turn and had the RTD official watch the speedometer. For the last two of these tests, Lent-Koop sat in the bus and watched the speedometer himself.

There is no showing the speedometer had been calibrated to be accurate. The markings on the speedometer were in the usual increments of five miles per hour. Based on watching the speedometer, Lent-Koop concluded the maximum speed Mr. Rodriguez could make the turn was six miles per hour.

At trial Mr. Rodriguez testified that his estimated speed at the time of the accident was between five and eight miles per hour. In his deposition he estimated it at between five and ten miles per hour or seven or eight miles per hour. Rodriguez indicated that on the day of the experiments the bus was not capable of going as fast as on the day of the accident.[1]

## DISCUSSION

■ Starting with photographs of the bus and plaintiff's body in what was assumed to be the positions they came to rest after the collision, the expert witness attempted to reconstruct the accident. Many decisions have excluded such expert testimony attempting to work backward from the point of rest, where under the circumstances of the case too many variables were involved, so as to make the opinion based primarily upon conjecture and speculation. (*Francis v. Sauve* (1963) 222 Cal.App.2d 102, 114-115 [34 Cal.Rptr. 754]; *Rudat v. Carithers* (1934) 137 Cal.App. 92, 95-97 [30 P.2d 435]; *Johnston v. Peairs* (1931) 117 Cal.App. 208, 215-216 [3 P.2d 617]; *Fishman v. Silva* (1931) 116 Cal.App. 1, 8-9 [2 P.2d 473]; but see *Box v. California Date Growers Assn.* (1976) 57 Cal.App.3d 266, 274-275 [129 Cal.Rptr. 146].) This is such a case.

---

[1]"Q. [Counsel for appellant] Did something happen to the bus when you were demonstrating it to Mr. Lent-Koop that prevented you from going at the same speed that you were capable of going in making your left turn on the day of the accident?

"A. [Mr. Rodriguez] That bus, we were making the test as far as he was—I had my foot all the way to the floor.

"Q. Sir, my question is, was the bus when you demonstrated it to Mr. Lent-Koop capable of going just as fast as it was going on the day of the accident and on every other day when you drove it?

"A. No, sir."

The expert's deduction as to the speed of the bus, which was crucial to his conclusion as to the point of impact, was based upon his experiment which lacked adequate foundation and was not conducted under conditions substantially similar to those on the date of the accident. (See *Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 549 [138 Cal.Rptr. 705, 564 P.2d 857]; *Culpepper v. Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110].) The experiment was conducted more than two years after the accident on a day, unlike the accident, when the weather and the pavement were dry. Though the same bus was used, it was not shown to be in substantially the same mechanical condition as on the date of the accident. On the contrary, the bus driver testified that at the time of the experiment the bus was not capable of going as fast as it did on the date of the accident even though he pressed the accelerator to the floor. The conclusion as to the maximum speed attainable by the bus during the experiment was apparently based upon a reading of the speedometer, but there was no showing that the speedometer was accurate or that the difference between six miles per hour and seven miles per hour could accurately be read. Such small differences in speed made big differences in the conclusion sought to be reached.

The other factors involved in calculation were also variable and uncertain. Crucial to the expert's conclusion were the assumed points of rest of the bus and of plaintiff's body. But after the actual impact the place the bus came to rest was still within the control of the driver to some extent, and the place plaintiff's body came to rest was also to some extent controlled by her, there being evidence that she took a few steps backward before falling. Several courts have indicated that no admissible expert opinion could be reached as to the course of vehicles or bodies after impact, where such course is still under varying elements of human control. (*Johnston v. Peairs, supra, Fishman v. Silva, supra.*) Because of the relatively slow speed of the bus and the short distances involved in determining whether plaintiff was or was not within the crosswalk, small differences in the driver's assumed perception time and reaction time and the bus' braking time crucially affected the conclusion.

Under all the circumstances, we conclude there was no´ adequate foundation for the expert's opinion testimony and that the trial court erred in admitting such testimony into evidence. There can be no doubt the error was prejudicial. All the eyewitness testimony placed plaintiff

in the crosswalk crossing with the green light and "walk" sign at the time of the accident. Lent-Koop's testimony was the only evidence placing plaintiff outside the crosswalk.[2] Without Lent-Koop's testimony it is extremely difficult to justify a defense verdict.[3]

## INVASION OF PRIVACY

At the close of plaintiff's case the trial court granted nonsuit as to plaintiff's second and third causes of action for invasion of privacy.[4] The theory of these causes of action is that two investigators of the bus company committed a tort by entering the emergency room of the hospital and asking plaintiff what happened, while she was still being treated by the emergency room physician.

The two investigators, David Moore and Earl Williams, were called as adverse witnesses by plaintiff and testified as follows: They were uniformed special agents for the bus company. They were dispatched in a patrol vehicle to the scene of the accident and there learned that plaintiff had been taken to California Lutheran Hospital. They drove to the hospital, arriving about 4:50 p.m. They entered the waiting room and asked the nurse at the desk the whereabouts of the lady who was involved in a bus accident and were told she was in the emergency room. Williams asked if it would be all right to talk to her. The nurse went into the emergency room, came back out and said it would be all right. She led them into the emergency room and to the gurney or bed on which plaintiff was lying. There were a number of other patients in beds in the emergency room. Each bed or gurney had a shower curtain

---

[2]Furthermore, the trial court excluded expert rebuttal testimony offered by plaintiff. During trial a professional photographer hired by plaintiff conducted a somewhat similar experiment, videotaping other buses making the turn at the intersection, as well as videotaping an assistant making a test turn purportedly at eight miles per hour. Plaintiff offered to prove that the videotape would show that buses of the same type as the accident bus can make the turn faster than six miles per hour. The trial court ruled that plaintiff's experiment lacked foundation as to the similarity of the buses involved. In light of our ruling as to defendant's experiment, we cannot say the court's exclusion of plaintiff's experiment was error, but the fact that plaintiff was not permitted to introduce rebuttal expert testimony contributes to the likely prejudicial effect of defendant's expert testimony.

[3]Perhaps from the testimony of Julia Sirias and Crescencio Rodriguez it could be inferred that plaintiff darted out into the way of the bus after the driver was committed to the turn. Perhaps it could be inferred plaintiff was inattentive and too concerned for her companion for whom plaintiff had been holding an umbrella, or that plaintiff was in a big hurry to get out of the rain.

[4]The third cause of action was against individual defendants; the second was against defendant SCRTD as employer of the individuals.

surrounding or partially surrounding it. Moore moved the curtain aside. Plaintiff was lying on her right side and was covered by a hospital covering. Moore was at the head of the bed facing plaintiff, Williams was at the foot. A doctor was on the other side of the bed at plaintiff's head, working on a wound at the upper left rear of plaintiff's head.

Moore asked the doctor if it would be all right to talk to plaintiff, and the doctor nodded yes. Moore told plaintiff that they were from the RTD and asked if she could tell them what happened. Plaintiff did not indicate any reluctance to talk. Plaintiff stated, in a whisper, that she was crossing in the crosswalk with a green light and the "walk" light. This conversation took only 30 to 45 seconds. Moore limited his inquiry to the simple "[w]hat happened?" and did not attempt to follow up on plaintiff's answer or question her any further. Williams and Moore then left.

We hold the trial court properly granted nonsuit. This case is not like *Noble* v. *Sears, Roebuck & Co.* (1974) 33 Cal.App.3d 654 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164], cited by plaintiff. There the court held that a cause of action for an "unreasonably intrusive investigation" was stated by the complaint. For purposes of reviewing a demurrer it was assumed in that case that the plaintiff had "an exclusive right of occupancy of her hospital room" and that the investigator gained admittance to her room and "by deception" secured information from her. (*Id.*, at pp. 657, 660; fn. omitted.)

Here, on the other hand, there was no showing of anything unreasonable in the conduct of the investigators. They were told by the nurse that it would be all right to approach plaintiff, and the doctor indicated that it would be all right to talk to plaintiff. Under these circumstances the fact that plaintiff was still undergoing treatment would not render unreasonable asking her what happened.

The investigators did not engage in any deception. They were uniformed and identified themselves clearly before asking the question.[5] The questioning was extremely brief, limited to the inquiry "[w]hat happened?" and there was no follow up interrogation. The question was not asked in a threatening way.

[5]They wore a tan or brown shirt and black tie, a tan or brown uniform slacks, a badge, a hat with a badge, and a gun. There is no evidence plaintiff was intimidated by the uniform.

None of the other factors cited by plaintiff justified submitting to the jury the issue of the reasonableness of the investigators' conduct.[6]

In No. C95198 (plaintiff Carlos Solis, Sr.) the judgment is reversed and the order denying motion for judgment notwithstanding the verdict is affirmed. In No. C90875 (plaintiff Luisa Solis) the judgment is reversed as to the first cause of action and affirmed as to the second and third causes of action, and the order denying judgment notwithstanding the verdict is affirmed.

Kaus, P. J., and Stephens, J., concurred.

---

[6]The emergency room doctor testified at trial that he did not recall the investigators having been there, although he did recall being very busy that day with three other critical patients besides plaintiff, and he opined that "in a life and death situation when you're responsible for not only this particular patient but your priorities are established, that you are to, again, save or salvage as much of the critically ill as possible, I think the last thing that would be of concern to you would allowing or even speaking to someone about an investigation or about questioning."

Moore testified that there was no "emergency that required" that he talk to plaintiff while her head was being treated. Williams stated that they were swamped with calls and needed to move on.

Plaintiff's adult son, Carlos Solis, Jr., was in the waiting room. He was told by hospital personnel that he could not go into the emergency room to see his mother. However, Moore and Williams were not aware of his presence and did not meet him until he approached them as they were leaving the emergency room.