[Civ. No. 64576. Second Dist., Div. Two. May 5, 1983.]

JOSEPH N. TILEM, Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Appellant.

## COUNSEL

Ira Reiner, City Attorney, Norman L. Roberts, Assistant City Attorney, and Kenneth Cirlin, Deputy City Attorney, for Plaintiff and Appellant.

Fadem, Berger & Norton and Michael M. Berger for Defendant and Appellant.

## OPINION

**COMPTON, Acting P. J.**—In February of 1978, the City of Los Angeles (City) filed an action in eminent domain as to a portion of two contiguous parcels of real property owned by Joseph Tilem (Tilem). Tilem was not served until June of that year.

Meanwhile, in June of 1978, Tilem filed an action against the City for inverse condemnation and damages. The two actions were subsequently consolidated, but just a month before trial, the City abandoned its action and the matter was tried on Tilem's complaint.

The judgment which was entered awarded Tilem some, but not all, of the damages and costs that he sought. Both sides have appealed.

The subject property, situated on the north side of Media Drive in the suburb of Highland Park, consists of two residentially zoned lots approximately 800 feet in length and 40 to 50 feet in width. Parcel 1 is improved with two 8-unit apartment buildings moved on to the land shortly after it was purchased by Tilem in or about 1970. Parcel 2 is undeveloped and has remained so since its acquisition.

The genesis of the instant litigation occurred in 1972, when Tilem learned that the city council had proposed a project to widen and improve Media Drive pursuant to the Improvement Act of 1911. (Sts. & Hy. Code, § 5000 et seq.) The plan, as originally proposed, required the taking of a six-foot strip of land extending the length of Tilem's property. The City's intention to go forward with the project was reaffirmed in February 1974, when a notice of determination was filed with the county clerk. Revised notices were filed in November 1976, after the City's engineer recommended extending the width of the street an additional 10 feet.

In January 1977, however, the scope of the project was again altered when the council adopted ordinance number 149201, declaring the City's intention to condemn only a 10-foot strip of Tilem's land. It is of interest that only Tilem's property was to be taken. The residential property on the other side of the street was to remain intact.

One of the more startling provisions of the ordinance was that the City proposed to finance the widening of the street by the creation of two assessment districts consisting entirely of Tilem's property. Thus whatever the City paid Tilem for the property plus the other costs of the judgment would be charged back to him as an assessment.

Two months later, the council, after conducting a public hearing at which Tilem appeared and registered his protest against the project, adopted two separate ordinances (Nos. 149445 and 149446), authorizing the condemnation of the 10-foot wide strip and establishing the one-man assessment districts. In September 1977, after appraising the property, the City offered $21,850 in compensation for the taking; said offer was refused as unreasonable. As noted earlier, the action in eminent domain was not filed until February of 1978.

Between 1972 when the project was first proposed, and 1976, Tilem paid little attention to the project and, for the most part, believed that it would not go forward. In mid-1976, however, Tilem found a building suitable for moving to parcel 2 and began preparations for its relocation. In July of that year, he visited the City's department of building and safety to ascertain the feasibility of the move on and to initiate the process of acquiring the necessary permits.

During conversations with departmental employees he was advised that a 10-foot setback from the improved street would be required. At the same time he was shown printed diagrams depicting the Media Drive widening project. Tilem then concluded that once the 10-foot strip of land was taken by the City, he would be unable to comply with the limit line requirements. He thereafter made no further attempt to go forward with the development of the vacant land.

In December 1977, Tilem concluded lengthy negotiations with Mr. and Mrs. Peter Asher (Ashers) and thereafter entered into an irrevocable lease-option agreement for the purported purchase of parcel 1. Under no circumstances could the option to purchase the lot be exercised until January 31, 1981. The purchase price was set at $225,000, with a total cash down payment of $52,000 less the amount of the option payments paid over the course of the tenancy. A basic monthly rental fee was set at $1,350. In accordance with other provisions of the agreement, this fee could reach as high as $3,000 per month.

Trial of the action was bifurcated into a legal issues phase and a valuation phase.[1] Since the City had abandoned its condemnation action before the commencement of trial, only two issues required resolution by the court: (1) "Whether condemnor engaged in any precondemnation activities for which condemnees are entitled to damages" and (2) "The amount of any precondemnation damages, if any."

---

[1]The reasons for bifurcation of the trial were set forth in the first pretrial conference order as follows: "This Court finds that the legal issues cannot be resolved by the valuation trial judge immediately prior to the impaneling of a jury [as requested by Tilem], because the appraisers will have to be advised of the date of valuation and as to the resolution of other issues which directly affect their appraisal reports, which must be exchanged at a Final Pretrial Conference prior to the valuation trial date."

The legal issues trial was held before the Honorable Arleigh Woods on May 15, 1979. Tilem and his valuation expert testified that the City's conduct had placed a "cloud" over both parcels of land, making it impossible to develop the vacant property and forcing a sale of the apartment complex at less than fair market value, and that compensation offered by the City for the taking was unreasonable. Tilem also argued that the creation of the assessment district was inequitable and discriminatory.

The City vigorously contested each of these claims, arguing that Tilem's property had suffered no diminution in value and that its conduct from 1972 onward had been fair and reasonable.

On September 26, 1979, Judge Woods rendered her interlocutory judgment in which she found that the City's precondemnation conduct had unreasonably interfered with Tilem's ability to use the vacant lot and to sell the developed property at fair market value. The court further concluded that the City had violated its duties under Government Code section 7267 et seq. by arbitrarily refusing to consider severance damages for either parcel in calculating its offer of compensation. It was further determined that the City had not commenced condemnation proceedings within the six-month period required by Code of Civil Procedure section 1245.260,[2] and that the lease-option contract was to be construed as a sales transaction for purposes of determining the extent of Tilem's damages.

Upon commencement of the valuation proceedings, both parties waived trial by jury and stipulated that the matter could be heard before the Honorable J. Wesley Reed. Both Tilem's expert, Kathy Shannon, and the City's appraiser, Robert Jackson, offered remarkably similar opinions as to the value of parcel 1, unaffected by the Media Drive project or the threatened condemnation. Shannon concluded that on January 1, 1978, the developed parcel was worth $290,000, while Jackson set the undiminished value of the property at $275,000. Both appraisers also gave their opinions as to the value of the lease-option. Tilem's appraiser reached the conclusion that, depending upon the date of the exercise of the option, the value to Tilem was from $43,000 to $92,000 less than the market value of the property.

---

[2]Code of Civil Procedure section 1245.260 provides in pertinent part: "(a) If a public entity has adopted a resolution of necessity but has not commenced an eminent domain proceeding to acquire the property within six months after the date of adoption of the resolution, or has commenced such proceeding but has not within six months after the commencement of such proceeding attempted diligently to serve the complaint and the summons relating to such proceeding, the property owner may, by an action in inverse condemnation, do either or both of the following: (1) Require the public entity to take the property and pay compensation therefor. (2) Recover damages from the public entity for any interference with the possession and use of the property resulting from adoption of the resolution."

The City's appraiser took the position that because of the tax benefits accruing to Tilem under the lease-option arrangement as distinguished from a straight cash sale, Tilem suffered no loss.

In relation to parcel 2, Tilem's appraiser fixed the loss at $6,300 and the City's appraiser valued the loss at $5,000.

Following trial, Judge Reed issued his rulings and judgment. He awarded Tilem the sum of $6,300 as damages for loss of use of parcel 2 during a 36-month period, but denied any recovery for parcel 1. Despite Judge Woods' earlier finding that the lease-option agreement constituted a "sale" of the apartment complex, Judge Reed concluded that there was no purchase and that Tilem was not entitled to damages. In so ruling, the court further determined that if a "sale" had occurred, Tilem would have sustained a loss in the amount of $10,679. Any tax benefits flowing to Tilem, however, were specifically excluded in appraising the value of the option.[3] Attorney fees and costs were awarded in the sum of $23,421.

On appeal, Tilem complains that Judge Reed was without jurisdiction to reevaluate the earlier finding that the lease-option constituted a sale for purpose of determining damages and that it was error for the court to preclude recovery for the diminution in value of parcel 1. He further argues that the award of costs was unreasonably low. For its part, the City generally assails Judge Woods' finding of liability for its precondemnation conduct and asserts that the award of damages and costs is contrary to law and not supported by substantial evidence.

The threshold question to be resolved on this appeal is whether the City's conduct would entitle Tilem to an award of damages. We have concluded that both the record and the law support the trial court's finding of liability in relation to both parcels of land.

Under the California Constitution, article I, section 19, compensation is required when property has been "taken or damaged." It is generally recognized

[3]In order to clarify the nature of the ruling as it relates to parcel 1, we set forth here several of the court's findings of fact and conclusions of law: "(2) . . . It is legally and practically possible that the optionees may exercise said option, and at that time, and if it is exercised, a sale may occur. At the time of trial it had not been exercised; it was a matter of speculation whether such would occur, and Tilem is still the owner and may remain as owner with full ownership rights in the property. Said lease and option is not a sale. . . . (5) If the option were to be exercised, it would be in the economic best interest of the Ashers, as optionees, to exercise the option at the earliest possible time—i.e. January 31, 1981. (6) The fair market value of Parcel 1, unaffected by threatened condemnation, as of January 1, 1978 was $275,000. (7) The value as of January 1, 1978 of the proceeds of the Lease and Option if the option were exercised on January 31, 1981, was $264,321.00. . . . (9) The total damages to the value of Parcel 1 as of January 1, 1978 . . . is the sum of $10,679.00, but such damages exist if and only if said option should constitute a sale. . . . [¶] The tax depreciation and other tax benefits retained by Tilem as owner of the property may not be considered in determining the value of the Lease-Option."

that the "damaged" language was added to our state Constitution to broaden the "taking" language found in the Fifth Amendment to the United States Constitution. The California Supreme Court has also noted that the technical distinction between "taking and damaging" has, for the most part, been blurred and that the terms are generally interchangeable. (*Holtz* v. *San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648, 652-654 [131 Cal.Rptr. 646, 552 P.2d 430].)

■ The concept of "taking" has with time changed from the notion of a physical seizure to that of a diminution of the owner's rights and attributes of ownership. The question in eminent domain proceedings therefore is not what the taker has gained, but what the owner has lost. (See *People* v. *La Macchia* (1953) 41 Cal.2d 738 [264 P.2d 15]; *City of Los Angeles* v. *Property Owners* (1982) 138 Cal.App.3d 114, 120 [187 Cal.Rptr. 667]; *United States* v. *General Motors Corp.* (1945) 323 U.S. 373, 377-378 [89 L.Ed. 311, 318, 65 S.Ct. 357, 156 A.L.R. 390]; *Agins* v. *Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25], affd. (1980) 477 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138].)

Accordingly, the rule has developed that a cause of action for inverse condemnation arises from a governmental invasion or appropriation of a valuable property right which directly and specifically affects the landowner to his injury. (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 119-120 [109 Cal.Rptr. 799, 514 P.2d 111]; *Smith* v. *State of California* (1975) 50 Cal.App.3d 529, 534 [123 Cal.Rptr. 745]; *Hilltop Properties* v. *State of California* (1965) 233 Cal.App.2d 349, 355-356 [43 Cal.Rptr. 605, 37 A.L.R.3d 109].)

In the seminal case of *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345], our Supreme Court recognized that such a cause of action could be predicated on a public agency's unreasonable conduct during precondemnation and postcondemnation activities. ■ Damages therefore may be recovered if it can be established that the governmental entity involved acted improperly, either by unreasonably delaying the institution of an eminent domain action following an announcement of intent to condemn *or* by other unreasonable conduct prior to condemnation, and that as a result of such action the property suffered a diminution in market value. (*Id.*, at pp. 51-52.)[4]

---

[4]In *Klopping,* the defendant City had initiated formal condemnation proceedings against the plaintiff's property, but abandoned the action after funding for the proposed project became unavailable. In its resolution authorizing dismissal of the suit, the City indicated its intention to acquire the previously condemned property some time in the future. The Supreme Court held that since the landowners had alleged a loss of rental income due to the precondemnation announcement, they had stated a cause of action in inverse condemnation. Justice Mosk, writing for the court, made clear that a condemnee must be given an opportunity to show that "(1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Id.*, at p. 52.)

The measure of damages may be the cost of repairs, the loss of use of the property, loss of rent, loss of profits, or increased operating expenses pending repairs. (See *Pacific Gas & Elec. Co.* v. *County of San Mateo* (1965) 233 Cal.App.2d 268, 274-275 [43 Cal.Rptr. 450]; *Frustuck* v. *City of Fairfax* (1963) 212 Cal.App.2d 345, 367-368 [28 Cal.Rptr. 357]; *Klopping, supra,* 8 Cal.3d at pp. 52-53.)

Code of Civil Procedure section 1245.260, subdivision (a)[5] provides that if a public entity has adopted a resolution of necessity but has not commenced an eminent domain proceeding to acquire the property within six months after the date of adoption of the resolution, or has commenced such proceeding but has not within six months after the commencement of the proceeding attempted diligently to serve the complaint and summons, the property owner may, by an action in inverse condemnation, do either or both of the following: (1) Require the public entity to take the property and pay compensation therefor; (2) recover damages from the public entity for any interference with the possession and use of the property resulting from adoption of the resolution. The land-owner is not required as a prerequisite to bringing such an action, to present a claim against the condemning entity. (Code Civ. Proc., § 1245.260, subd. (b).)

These provisions, affording some protection to those whose property is the subject of a resolution of necessity, do not affect or limit an owner's fundamental right to bring an inverse condemnation action under article I, section 19, of the California Constitution.[6] (See Law Rev. Com. comment to Code Civ. Proc., § 1245.260.) In this regard, we note that "[r]ecovery of precondemnation damages under *Klopping* requires a showing of *either* unreasonable delay or 'other unreasonable conduct,' but not both. [Citations.]" (*People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332, 357 [153 Cal.Rptr. 895]; italics added.)

When we apply these principles to the case at bench, we must conclude that the trial court's determination of liability was correct. In *Klopping,* the stated intent of the defendant City to condemn in the future was said to be a "cloud" on the property. The high court went on to say that activities which might give rise to such damages could be significantly less than a de facto taking of the property. Without a doubt the City's conduct in the case under review placed a substantial "cloud" over both parcels of land owned by Tilem.

[5]Code of Civil Procedure section 1243.1, the predecessor statute to section 1245.260, was enacted several months before the decision in *Klopping* was rendered. (See *Klopping, supra,* 8 Cal.3d at p. 57.)

[6]Article I, section 19 provides in pertinent part: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

From July 1976 to April 1979, a period of almost three years, Tilem was prevented from developing the vacant property known as parcel 2. The City's proposed taking of a 10-foot strip of land, in conjunction with the department of building and safety's 10-foot setback requirement, rendered the real estate virtually useless. It is beyond dispute that after the proposed widening of Media Drive, the lot would have been too shallow to develop. The City's conduct went far beyond the tentative general planning discussed in *Selby Realty Co.* v. *City of Buenaventura, supra,* 10 Cal.3d at pages 119-120, to the point of filing a condemnation action in court and beginning the removal of trees and other foliage from the property.

It seems obvious to us that formidable obstacles were placed in Tilem's path in the use of his land. This was not vacant real estate owned and held as a speculative business venture but land that was intended to be developed from the time it was purchased. Once that development became feasible, it was prevented by the City's actions. The proposed Media Drive widening project, and the activities undertaken by the City in relation thereto, had a clear and measurable effect upon Tilem's property rights.

We reject the City's argument, as did the trial court, that Tilem should be foreclosed from asserting inverse condemnation because he failed to exhaust his administrative remedies by seeking a building permit. The law does not require useless acts. (Civ. Code, § 3532.) Not only did Tilem discuss the project and setback requirements with employees at the department of building and safety, he was shown printed diagrams that clearly established that once the City took the additional 10 feet of land from the lot he would not be able to comply with the limit line regulations. The court's finding that it would have been futile to go through the array of procedures necessary to obtain a permit or a variance is supported by the evidence. Under the circumstances, any such permit would, in all likelihood, have been denied. "The doctrine of exhaustion of administrative remedies does not apply when it is established that an attempt to exhaust such remedies would have been futile." (*Taper* v. *City of Long Beach* (1982) 129 Cal.App.3d 614, 615 [181 Cal.Rptr. 169].)

We next consider the trial court's finding of liability in relation to parcel 1, the developed property. The trial court concluded that the City's precondemnation conduct was unreasonable and directly and specifically interfered with Tilem's use and enjoyment of his property, that the City's offer of compensation in September 1977, and its refusal to consider severance damages were both unreasonable and that the City's activities constituted a breach of statutory duty under Government Code section 7267 et seq.[7]

---

[7]Government Code section 7267.1, subdivision (a) provides that: "The public entity shall make every reasonable effort to acquire expeditiously real property by negotiation."
Government Code section 7267.6 reads: "If any interest in real property is to be acquired by

■ While it has been held that violation of the provisions of Government Code section 7267 et seq. do not give rise to a separate cause of action or a right to damages not already legally recognized (Gov. Code, § 7270; *Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 958 [162 Cal.Rptr. 210]), these statutory directives do provide a ready guide for determining whether a public agency has engaged in unreasonable or oppressive precondemnation conduct as defined in *Klopping* and its progeny.

■ There can be no doubt that Tilem's ability to market the property was impaired. At the time Tilem entered into the lease-option agreement with the Ashers, the property was under the direct threat of condemnation. Moreover, whoever owned the land was faced with the possibility of an assessment for the street project that ranged in amount from $60,000 to $200,000.

The City's inadequate offer of compensation, made three months prior to the execution of the lease-option agreement, directly affected Tilem's ability to obtain the fair market value of his property. This is especially true in light of the ten month's delay in filing and serving the condemnation action after passage of the resolution of necessity coupled with the proposal that the property owner alone would be forced to pay for the entire project.

For all intents and purposes, the Ashers were purchasing a lawsuit when they entered into the contract with Tilem. The "cloud" on the property was undoubtedly caused by the City's conduct. That this conduct affected the value of the land at the time the option was executed needs little elaboration. Common sense tells us that the $21,000 offer of compensation by the City in the face of a possible assessment of at least $60,000 did nothing to enhance the value of the property in the eyes of prospective purchasers.

Having determined that the trial court's finding of liability is consistent with the applicable legal principles and supported by the record, we must now examine the procedures utilized by the court in assessing damages.

We first dispense with Tilem's argument that Judge Reed exceeded his jurisdiction when he overruled the prior finding that the lease-option contract constituted a "sale." In so arguing, he refers us to the general rule, articulated by us in *People* v. *Woodard* (1982) 131 Cal.App.3d 107, 111 [182 Cal.Rptr. 254], that the superior court, "though comprised of a number of judges is a single court and one member of that court cannot sit in review on the actions of another member of that same court." Tilem's reliance on *Woodard* is misplaced.

exercise of the power of eminent domain, the public entity shall institute formal condemnation proceedings. No public entity shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property."

The findings of fact and conclusions of law prepared at the conclusion of the liability phase of this action constituted nothing more than an interlocutory or provisional order. As such, it was subject to modification at the trial level after further evidence or law had been considered. (*Travelers Ins. Co.* v. *Superior Court* (1977) 65 Cal.App.3d 751, 760 [135 Cal.Rptr. 579].) ▉ "[I]f, after an interlocutory judgment, the rest of the case is tried before a different judge, he may make new findings and a different decision in rendering final judgment." (4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 8, p. 3187; see also *Lacey* v. *Bertone* (1952) 109 Cal.App.2d 107, 110 [240 P.2d 395].)

▉ Although the court, during the valuation proceedings, had the power to reconsider and modify the prior findings of Judge Woods, we believe it erroneously concluded that the lease-option was not a "sale" for purposes of determining damages.

Undisputed testimony during trial established that the sale of parcel 1 had been structured as an option to purchase solely for income tax purposes. As between Tilem and the Ashers, execution of the agreement in December 1977 was tantamount to a sale. We find further support for this conclusion in the document itself. Although the agreement consistently refers to itself as an "option," it provides for substantial and immediate continued payments on the purchase price before exercise of the option may occur.

The trial court, in reaching the conclusion that no sale had occurred, appears to have placed greater emphasis on the form of the transaction than the intent of the parties. Our Supreme Court, however, has held that the property-contract labeling process is not necessarily determinative, especially where questions of due process compensation are involved. (*County of San Diego* v. *Miller* (1975) 13 Cal.3d 684, 691 [119 Cal.Rptr. 491, 532 P.2d 139].) "Although the description of an instrument by the parties may bear some weight on the question of its interpretation, the name by which the parties designate their contract is not determinative of its nature. For instance, calling an agreement a lease does not make it such. Reference must be had to the instrument itself, to a reading and consideration of all its terms, conditions, and covenants to determine its true character. The designation of a contract by an improper term cannot be allowed to take away a substantial right, where all the circumstances attending it are fully detailed. Similarly, the form of the instrument is of little account in determining its true interpretation." (14 Cal.Jur.3d, Contracts, § 185, pp. 451-452.)

Although we recognize that an option differs, at least in a technical sense, from a contract of purchase and sale under which fixed payments in fixed amounts on the purchase price are required, we do not find that fact controlling. Practically speaking, the agreement entered into by Tilem and the Ashers

amounted to a contract of purchase and sale with monthly installment payments, under a requirement that the entire balance be paid on or before January 31, 1990. Of course, the buyers could at any time give up their right, "while avoiding further liability under the agreement, by discontinuing payments and forfeiting those already made; but such a provision is permitted, and is by no means uncommon, in purchase sale agreements." (*Smith* v. *Morton* (1972) 29 Cal.App.3d 616, 620 [106 Cal.Rptr. 52].)

We conclude therefore that the lease-option agreement at issue was not a mere option to buy, but was instead, a contract of purchase and sale, and that such was the intent of the parties to the transaction. (See *Smith* v. *Morton, supra,* at p. 620.)

■ Although the parties have cited no case on point, and our independent research has revealed none, we believe that the trial court was correct in concluding that if a sale did occur, the tax benefits flowing to Tilem could not be considered in determining the value of the lease-option. Even a cursory review of the record makes clear that the testimony of the experts on this issue was rife with speculation.

It is well settled that conjectural and speculative matters may not "be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, . . ." (Evid. Code, § 801, subd. (b).) The reason for such a rule is obvious. Speculative opinions are inherently unreliable and have little, if any, tendency in reason to prove a disputed fact. (Evid. Code, § 210; see *People* v. *De La Plane* (1979) 88 Cal.App.3d 223, 242-243 [151 Cal.Rptr. 843].) Appellate courts traditionally give wide latitude to trial courts in determining whether the matters testified to by an expert are too speculative to be relevant. (See *Solis* v. *Southern Cal. Rapid Transit Dist.* (1980) 105 Cal.App.3d 382, 389-390 [164 Cal.Rptr. 343].) This is especially true in eminent domain actions where valuation evidence frequently tends to be highly complex and esoteric.

After a thorough review of the record in the instant case, it appears to us that the method by which the City sought to determine the value of the option contract runs afoul of these fundamental principles. The valuation of a particular sales transaction is an exercise which focuses on the intricacies and subtleties of the marketplace, not the personal worth of the seller or buyer.

■ The basic measure of damages in inverse condemnation actions, as in all eminent domain proceedings, is "market value." That term generally refers to the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular urgent necessity for so doing, each dealing with the other with full

knowledge of all the uses and purposes for which the property is reasonably adaptable and available. (Code Civ. Proc., § 1263.320, subd. (a).) This well-accepted definition makes clear that a determination of fair market value must be divorced from any specific arrangements made between the parties and from any benefits that may incidentally accrue because of the nature of the underlying transaction. This is in accord with the generally recognized rule that tax consequences are not considered in an award for damages. (See *Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626 [151 Cal.Rptr. 399]; *Henninger* v. *Sourthern Pacific Co.* (1967) 250 Cal.App.2d 872 [59 Cal.Rptr. 76].)

Underlying the entire valuation process is the constitutional requirement of "just compensation." Accordingly, it has been observed that "just compensation must be based upon the value of the rights taken, without regard to the personality of the owner or his personal relationship to the property taken. The value of the property for his personal purposes must be disregarded." (4 Nichols, The Law of Eminent Domain (3d ed. rev. 1971) § 12.22[2], p. 12-110.)

■■■ That every sales transaction generates some form of tax consequences needs little discussion. If, however, such consequences were permitted to be considered in eminent domain proceedings, the constitutional requirement of just compensation would be swallowed whole. We conclude therefore that the value of the lease-option agreement in the case at bar must be valued separate and apart from any tax benefits that may accrue to Tilem. (Cf. *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 141-144 [135 Cal.Rptr. 802].)

■■■ Turning briefly to the assessment of damages in relation to parcel 2, the City generally argues that the award was improper and that, in any event, the trial court erred in selecting July 1976, as the date from which Tilem could recover for the loss of use of his land. We reject both contentions.

As noted previously, the record more than adequately supports the conclusion that Tilem was entitled to damages as a result of the City's unreasonable precondemnation conduct. The City plainly "took" away Tilem's ability to use his land for a substantial period of time. That taking required the payment of damages. Since "[t]he type of direct and special interference required for precondemnation damages can occur even in the absence of a formal resolution of condemnation" (*People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc., supra,* 91 Cal.App.3d at p. 356), the trial court's selection of July 1976 as the date from which damages were to be measured was correct. It was during that month and year that Tilem abandoned the idea of developing the property because of the impending Media Drive project, a project which would have

rendered the lot too shallow for construction of an apartment complex. In our judgment, this loss of use constituted a substantial interference with Tilem's property rights. Under the circumstances, the damages awarded by the court were reasonable and just. (Cf. Code Civ. Proc., § 1268.620.) The City's other arguments pertaining to parcel 2 are without merit and do not warrant further discussion.

■ We next consider the trial court's award of costs. Tilem submitted a claim for costs which included some $70,000 in attorney fees. These fees were incurred in three activities (1) defense of the City's action for eminent domain, (2) prosecution of Tilem's action in inverse condemnation, and (3) the institution of a civil rights action (42 U.S.C.A. § 1983) in the federal district court.[8]

On the basis of this undifferentiated claim, the trial court awarded $15,000 attorney fees and $8,421.62 in appraisal fees and other litigation expenses. While this award specifically excluded any amount attributable to the federal action, it did not differentiate between the two state court actions.

The right to fees and costs is, of course, purely statutory. *La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309 [19 Cal.Rptr. 479, 369 P.2d 7], and Code of Civil Procedure section 1268.610 provide that the defendant in a direct condemnation case is entitled to recover his or her litigation costs whenever the proceeding has been wholly or partly dismissed for any reason.

"It is well settled that . . . [section 1268.610] permits attorney's fees to be allowed for services rendered in connection with the proposed taking, whether those services are rendered before or after the filing of the action, and whether the eminent domain proceeding is abandoned prior or subsequent to trial. [Citations.] . . . [T]he statute contemplates that a defendant be reimbursed for reasonable attorney fees incurred not only in the preparation for the trial and his services during trial, but also for services necessarily incident to the accomplishment of the statutory objectives. . . . [T]he letter and spirit of the . . . [the statute] is to make the defendant whole for the reasonable attorney fees incurred by him in connection with the defense of an eminent domain action which the condemner has voluntarily abandoned." (*Decoto School Dist. v. M. & S. Tile Co.* (1964) 225 Cal.App.2d 310, 313-315 [37 Cal.Rptr. 225]; see also *La-Mesa Spring Valley School Dist. v. Otsuka, supra,* 57 Cal.2d at p. 317.) "In any inverse condemnation proceeding brought for the taking of any interest in real property," the landowner is entitled to recover an additional sum that will reimburse him or her for "reasonable costs, disbursements, and expenses,

---

[8]This action was specifically addressed to the creation of the assessment districts. It apparently did not proceed beyond the complaint stage.

including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding." (Code Civ. Proc., § 1036.)

Though not directly relevant here, Code of Civil Procedure section 1250.410 provides that in an action for eminent domain, the property owner is entitled to recover litigation costs including attorney fees if the condemning authorities' pretrial offer of compensation is unreasonable.

These statutory provisions are a clear manifestation of the Legislature's desire to prevent property owners from being forced to bear the cost of expensive litigation in order to protect their property interests against unreasonable governmental conduct.

In *Stone* v. *City of Los Angeles* (1975) 51 Cal.App.3d 987 [124 Cal.Rptr. 822], Division Four of this court concluded that Code of Civil Procedure section 1036 did not permit awarding of litigation costs in an action for inverse condemnation based on damages suffered as a result of unreasonable precondemnation activities. The rationale of that decision was based on the distinction between "taking" and "damaging" of property, and discerned a legislative intent to limit the application of Code of Civil Procedure section 1036 to a "taking."

Subsequently, the Supreme Court in *Holtz* v. *San Francisco Bay Area Rapid Transit Dist., supra,* 17 Cal.3d 648, held that a distinction between "taking" and "damaging" is not necessary for recovery of litigation costs.

"[T]he legislative history of section 1246.3 [now Code Civ. Proc., § 1036] supports the conclusion that it was designed to expand the right to recover litigation costs beyond situations in which tangible real property has literally been removed from possession of its owner. . . . It is apparent . . . that the Legislature intended to include not only the taking of physical possession or title to real property, but also encroachments upon lesser property interests." (*Id.,* at p. 653.)

*Orme* v. *State of California* ex rel. *Dept. Water Resources* (1978) 83 Cal.App.3d 178 [147 Cal.Rptr. 735], relying on *Holtz, supra,* allowed litigation costs to a landowner in an inverse condemnation case where underground seepage of water onto private land from a state water project had made it impossible during a period of two years for the landowner to plant rice, his most profitable crop.

We see no legal difference between physical damage and economic damage, or the difference between water seepage and a "cloud" on the property. The inability to grow rice as a diminution of the property owner's right to use his

property does not differ conceptually from the inability of the property owner to sell at market value or develop the property by the erection of a building thereon.

Further, our reading of *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, does not reveal any basis for making a distinction between "taking" or "damaging" or in the type of property interest impaired. The language of *Klopping* makes it clear that while the court noted differences between the traditional "taking" under eminent domain and an action for inverse condemnation, it referred to unreasonable precondemnation conduct as "activities by the condemner which constitute *a taking of the property* even though no summons has been issued." (*Id.,* at p. 47; italics added.)

We hold that Tilem here was entitled to recover litigation costs including attorney fees, incurred in both the abandoned eminent domain action and the inverse condemnation action.

Relying upon several recent federal court cases (*New York Gaslight Club, Inc.* v. *Carey* (1980) 447 U.S. 54 [64 L.Ed.2d 723, 100 S.Ct. 2024]; *Bartholomew* v. *Watson* (9th Cir. 1982) 665 F.2d 910), Tilem argues that he is entitled to recover in this action the costs expended in the prosecution of his federal suit. We disagree.

A review of those portions of eminent domain law providing for recovery of litigation expenses makes clear that the Legislature intended to allow recovery only for actions brought in state court. No authority to the contrary has been cited to us. Although Tilem is correct in his assertion that but for the City's action the suit in federal court would have not been filed, nothing in the law required that action to be brought as a prerequisite to relief in the courts of this state.

In the federal cases cited to us by Tilem, *New York Gaslight Club, Inc.* and *Bartholomew,* the plaintiffs were allowed recovery for costs expended in related state court actions. In both cases, however, the initial pursuit of state remedies was, as a matter of federal law, a necessary prerequisite to the filing of claims in federal court. Accordingly, we must agree with the City that the question of entitlement to and the amount of any attorney fees claimed in federal court must depend upon federal law and the progress and eventual outcome of that case.

On the other hand, from what we can discern from the record, it would appear that relatively a small portion of the claimed attorney fees would have been for services devoted to the federal action. Yet we have no way of determining

how the trial court arrived at the figure of $15,000 for attorney fees in the state actions as against a total undifferentiated claim of $70,000.

Since we have concluded that the matter must be returned to the trial court to redetermine the issue of damages, we think it appropriate to also provide the trial court an opportunity to redetermine the amount of litigation costs and set forth the reasons therefor.

The judgment, insofar as it determines that the City is liable for damages for both parcels and fixes the damages at $6,300 for parcel 2, is affirmed.

The remainder of the judgment is reversed. The matter is remanded to the trial court with directions to determine the damages to parcel 1, and the reasonable amount of litigation expenses to be awarded to Tilem in accordance with this opinion. The City to bear the costs of both appeals.

Beach, J., and Gates, J., concurred.

A petition for a rehearing was denied May 25, 1983, and the petition of defendant and appellant for a hearing by the Supreme Court was denied August 24, 1983.